**Kathleen Madaline JARVIS, Individually and as a parent and guardian of Paul Michael Attila Jarvis, a minor, Plaintiff–Appellant,**

v.

**FORD MOTOR COMPANY, Defendant–Appellee.**

**Docket Nos. 99–9405(L), 00–9215(CON).**

United States Court of Appeals, Second Circuit.

Argued May 14, 2001.

Decided Feb. 7, 2002.

Thomas J. Murray, Murray & Murray Co., L.P.A., Sandusky, OH (George N.

Tompkins, Jr., Schnader Harrison Segal & Lewis LLP, New York, NY, and Mary S. Birkett on the brief), for plaintiff-appellant.

Jeffrey C. Sendziak, Gibson, McAskill & Crosby, Buffalo, NY (Brian P. Crosby on the brief), for defendant-appellee.

Before: OAKES, Van GRAAFEILAND, and SOTOMAYOR, Circuit Judges.

Judge VAN GRAAFEILAND concurs in part and dissents in part in a separate opinion.

SOTOMAYOR, Circuit Judge.

A six-day-old 1991 Ford Aerostar driven by plaintiff-appellant Kathleen Jarvis suddenly accelerated, resulting in an accident from which Jarvis sustained serious injuries. Jarvis contends that the Aerostar "took off" without her depressing the accelerator and that she was unable to stop the van by pumping the brakes.

Jarvis sued defendant-appellee Ford Motor Company ("Ford") in the United States District Court for the Southern District of New York (Buchwald, J.) claiming, *inter alia,* that Ford was negligent and should be held strictly liable for the design of the Aerostar's cruise control mechanism. A jury returned a verdict for Jarvis on her negligence claim but not on her strict products liability claim and awarded her damages. Ford objected to the verdict as inconsistent. The district court agreed but did not assign a remedy because it held that the evidence was insufficient to support a verdict for Jarvis, granting Ford's Fed.R.Civ.P. 50(b) motion for judgment as a matter of law and dismissing the complaint. For the sake of completeness, the court also granted Ford's motion to reduce the amount of the verdict because of collateral source payments pursuant to N.Y.C.P.L.R. 4545.

We vacate the grant of judgment as a matter of law for Ford and remand for the district court to reinstate the jury verdict and award of damages as adjusted by the collateral source payments. Jarvis's evidence, if credited by the jury, was sufficient to establish that the Aerostar malfunctioned due to Ford's negligent design. To prove negligence, Jarvis was not required to establish what specific defect caused the Aerostar to malfunction. Ford, for its part, did not prove that a malfunction was so unlikely as to warrant judgment as a matter of law in its favor.

We also hold that the district court failed to apply the correct legal standard to Ford's objection to an allegedly inconsistent verdict. Applying the correct standard under Fed.R.Civ.P. 51, we find that Ford waived any claim of error by failing to state distinctly the nature and basis of its objection before the jury retired to deliberate and that there was no fundamental error in the jury instructions or verdict sheet warranting relief on appeal. Finally, we hold that the district court did not abuse its discretion in not conducting a hearing on collateral source payments, as Jarvis failed to raise a disputed issue of material fact regarding Ford's evidence of such payments.

## BACKGROUND

Viewed in the light most favorable to Jarvis as the party challenging the grant of judgment as a matter of law, the record presents the following facts.

A. The Accident

Jarvis testified at trial that, in 1991, she started her six-day-old Ford Aerostar in the driveway of her home in rural Woodstock, New York with her right foot "lightly on the brake." After she turned on the ignition, the engine suddenly revved and the vehicle "took off." As the van acceler-

ated, Jarvis pumped the brake with both feet, looking down to make sure her feet were on the brake pedal. The van would not stop. She steered to avoid people walking in the road and then heard saplings brushing against the side of the van before she blacked out. Jarvis testified that she had driven many different kinds of vehicles over the twenty-four years since she had first acquired a driver's license, and that, prior to this incident, she had never had a driving accident.

Jarvis's father, who was standing nearby, testified that he saw the car starting off at an "unusually fast speed" for his daughter. As the Aerostar passed him, he saw Jarvis "holding on to the steering wheel very tight and her body was going back and forth ever so slight[ly]." Jarvis's father testified that as Jarvis was removed from the van after the accident, she screamed, "there's something wrong. The brakes don't work. There's something wrong with that car. The brakes don't work." As a result of the accident, Jarvis sustained a traumatic head injury and could not return to her previous employment.

Plaintiff's reconstruction expert, George Pope, testified that the van traveled approximately 330 feet and did some braking that slowed it to 15 to 20 miles per hour before it entered a ditch and turned over. Pope testified that the Aerostar had vacuum power brakes that draw their vacuum from the engine, but that the engine does not create the necessary vacuum when accelerating full throttle. Even though a check valve traps a reservoir of vacuum for use when the engine vacuum is low, this reserve can be depleted after one-and-a-half hard brake applications. Therefore, according to Pope, if Jarvis were pumping the brakes in an effort to stop the Aerostar after it began accelerating at full throttle, she would lose approximately one thousand pounds of additional force that the booster normally could supply to her brakes. Pope concluded that "under those circumstances [ ]it will feel to a person like they've lost their brakes, [because] they're pushing and nothing is happening."

Joanne Valentine–Simonian, a passerby, testified that she watched Jarvis's van pass and that she saw the van moving quickly down the road and ran toward the woods. As she looked back to see the van pass, she did not see any brake lights. A police officer who was called to the scene of the accident testified that he saw no marks on the road near the accident except in the ditch where the Aerostar turned over. Jarvis's father had been the last one to use the Aerostar before the accident. When asked at trial whether he had left the parking brake on, Jarvis's father testified that it was his "normal habit" to put it on, but that he had "no memory of it as such" in this case. When asked directly, he answered, "I'm not certain I put it in with the parking brake on." Pope testified that the Aerostar has two instrument panel lights related to the braking system. When the parking brake is left on, a red light is illuminated on the right side of the dash below the horizontal center point. A second light, amber in color and located on the upper left corner of the dash panel, is related to the rear anti-lock brake system and will illuminate for two seconds after the ignition is turned on and the van moves forward while the system reviews its components to ensure that they are functioning properly. Jarvis testified that she saw one white or light yellow light illuminated high on the dashboard toward the left and that, "as I'm recalling[,] it said brake." Asked specifically if she had seen a red light illuminated on the panel from the beginning to the end of the incident, she answered no.

In support of Jarvis's claim that the Aerostar had suddenly accelerated without her pressing the accelerator, Jarvis presented testimony from other Aerostar owners who recounted having similar problems. Jacqueline Gibbs testified that she had her foot on the brake the entire time her 1989 Aerostar sped away, yet engineers at Ford could later find nothing mechanically wrong with the van. David Neil Morse testified that a two-day-old 1990 Aerostar he was driving opened up, full throttle, while he was stopped at a gas station and that, even though he weighed 200 pounds and pushed as hard as he could on the brake pedal, he only managed to stop the vehicle by turning off the ignition.[1] Theda Gayle Blackstone testified that, when she attempted to restart her 1990 Aerostar at a gas station and put it in gear, even though her foot was on the brake, it "absolutely roared and leapt out" hitting cars and continuing onto the highway causing accidents. Mary Moore testified that in 1989 she started her Aerostar in a shopping center parking lot and it began to accelerate in reverse, even though she had her foot on the brake. Linda Karen Schmidt testified that her 1990 Aerostar, after less than 10,000 miles of use, first "tore backwards" when she shifted into reverse, and then went forward as she tried to shift into park, eventually causing her to jump from the van after she failed to stop it by pressing the brake with both feet. In addition, the jury was presented with evidence that Ford had received reports of incidents of sudden acceleration in a total of 560 Aerostars.

Jarvis filed this diversity action in the Southern District of New York (Naomi Reice Buchwald, Judge) alleging that a defect in the Aerostar had caused the sudden and uncontrollable acceleration and pleading causes of action under theories of negligence and strict products liability under New York law. In 1999, a jury trial was held. Jarvis relied principally on her own testimony that her Aerostar suddenly accelerated without her depressing the accelerator and on experts who offered a theory to explain why the Aerostar malfunctioned and how this defect could be remedied. In its defense, Ford claimed principally that the acceleration was the result of Jarvis's driver error that mistook the accelerator pedal for the brake pedal, while unaware that the parking brake had been set. Ford also presented expert testimony to show that the Aerostar could not have malfunctioned in the manner suggested by Jarvis's experts.

B. Jarvis's Sudden Acceleration Theory

Samuel J. Sero, an electrical engineer, testified at trial as an expert for Jarvis. He hypothesized that unintended electrical connections had caused current to run to the cruise control "servo," opening the throttle and making the vehicle accelerate. The cruise control servo opens the throttle by means of a vacuum mechanism that has two valves, the vacuum, or "vac," valve and the vent valve. The vent and vac valves are controlled by wires attached to the "speed amplifier." Victor J. DeClercq, a former Ford design analyst engineer and expert for Ford, agreed that if there was a simultaneous short in the vent and the vac

1. Although we need not reach the evidentiary issues raised by Jarvis on appeal, we note that Jarvis had wanted to admit into evidence a Ford Aerostar's shop manual that cautioned Ford dealers and technicians to turn off the ignition should the Aerostar "go out of control and overspeed" during road-tests for cruise control malfunctions. Jarvis claimed that this manual demonstrated that Ford was aware of the danger of sudden acceleration and understood that braking might not be effective in stopping an Aerostar experiencing sudden acceleration.

wires, the cruise control servo would open the throttle without the driver pressing the accelerator.[2] The dispute among the experts, however, was whether these kinds of electrical malfunctions could spontaneously occur and, if so, whether a failsafe mechanical device called a "dump valve" would, despite these malfunctions, disengage the cruise control servo as soon as Jarvis pressed the brake pedal, bringing the sudden acceleration to an end and the vehicle to a stop. DeClercq stated that, to the best of his knowledge, Ford did not test for the fault that Sero suggested as part of its standard failure mode effects analysis of its vehicles.

Sero's theory requires two simultaneous malfunctions in the cruise control circuitry. The first is an open ground connection to the speed amplifier, resulting from a loose or broken wire. DeClercq testified that he examined the ground wire in Jarvis's Aerostar after the accident and did not find any evidence that it was cut, was loose, or had shorted out. Sero testified that by the time he examined Jarvis's Aerostar, certain repairs had been made and some parts had been removed from the vehicle for examination, making it difficult to know what condition the wires were in at the time of the accident. The second problem required under Sero's theory is a fault to ground of the vent or the "vac" wires.[3] According to Sero, an unintended grounding of the vent or the vac wire could occur due to (a) moisture or debris on the circui-

try; (b) heat that causes the circuit board to "expand" or "bow up"; or (c) a nick in the wire insulation permitting direct contact with metal. There was no physical evidence that any of these events occurred at the time of Jarvis's accident, but Sero described these as "random transient events"—the first two, at least, could potentially leave no trace. Ford tested the moisture hypothesis by spraying water outside the vehicle and under the hood for one minute and then ran it for fifteen minutes without encountering any problems.

## C. The Dump Valve

Ford maintained at trial that the existence of the Aerostar's dump valve, a spring-loaded plunger designed to open when the brake pedal is depressed, would have effectively stopped the Aerostar from accelerating when Jarvis applied the brakes, even if the cruise control malfunctioned as Sero suggested. The dump valve is a mechanical—as opposed to electronic—device that releases a vacuum and closes the throttle, terminating any wide open throttle condition and returning the throttle to neutral. Jarvis testified that she tried to stop the Aerostar by pumping the brakes, as her father had taught her to do when she was first learning to drive.

Jarvis offered three possible explanations at trial for why the dump valve did not permit Jarvis to stop the Aerostar from accelerating: (1) the dump valve was

---

**2.** DeClercq suggested that these faults would open the throttle approximately 75%.

**3.** Sero also stated that the same malfunction could result if both the vent and vac wires were grounded at the same time.

Sero proffered a separate theory that does not depend on grounded wires but rather on a stray electromagnetic signal to fire the output transistors on the speed amplifier. *Jarvis v. Ford Motor Co.*, No. 92 Civ. 2900(NRB), 1999 WL 461813, at *3 (S.D.N.Y. July 6, 1999).

Sero suggested this signal could come from "radio frequency, electromagnetic induction, electrostatic discharge, spiking off the generator, or the variable speed sensor." *Id.* Following a pre-trial *Daubert* hearing, the district court deemed that the testimony regarding this theory was inadmissible after finding that "Sero had neither replicated this condition in a model nor witnessed it in real life prior to the hearing." *Id.* at *4.

malfunctioning; (2) Jarvis was pumping the brakes, causing the Aerostar to reinstate the electrical malfunction and commence acceleration every time her foot rose from the pedal in the pumping action; or (3) Jarvis had not pressed far enough on the brakes to activate the dump valve. Concerning the first alternative, DeClercq testified that he tested the dump valve after the accident and found that it had no leaks. There was no evidence as to whether the dump valve could have malfunctioned in some other way that would not have necessarily been evident at the time that DeClercq examined the Aerostar. In response to questioning at trial as to why the dump valve would not have prevented the accident, Sero stated, "You are assuming that the dump valve was open. I think that's not a very good assumption. You have no proof that it was, nor do I. We have also no proof of how hard she was on the brake." In response to a question by Ford concerning whether Sero had "any evidence" that the dump valve was not functioning properly the day of the accident, Sero responded: "No, nor is there evidence that it did function that way on the day of the accident, except for the fact that it took off, which would seem categorical evidence that it did not function correctly."

The experts appear to agree that, even assuming that the dump valve was functioning properly, the electrical malfunction in the cruise control could be reinstated every time Jarvis lifted her foot from the brake pedal, causing the Aerostar to begin accelerating anew. The third scenario could explain why the Aerostar initially accelerated while Jarvis had her foot only

"lightly" on the brake before she turned on the ignition but would not explain why the dump valve did not open later when Jarvis had her feet firmly on the brake pedal.

### D. Possible Alternative Designs

Sero testified that the possible malfunctions he had elucidated could be avoided by installing an inexpensive on/off switch, costing a few dollars at most, in the cruise control mechanism that would allow power to the servo only when the cruise control was engaged. Alternatively, Sero suggested the installation of an "over current relay," which would sense the grounding problem and stop the acceleration. According to Sero, these solutions would address the root cause of the possible malfunctions in the design of the Aerostar that permit battery power to be supplied to the servo at the moment the ignition is turned on without the driver having engaged the cruise control or stepped on the accelerator.

### E. The Jury Verdict

After a two-week trial, the jury found that the cruise control system of the 1991 Aerostar was not "designed in a defective manner," but that Ford nevertheless "was negligent in the design of the cruise control system" and that this was a substantial factor in causing the accident. The jury found that Jarvis's negligence was also a substantial factor in causing the accident and apportioned 65% of the fault to Ford and 35% to Jarvis.[4] The jury awarded damages for past and future medical insurance premiums, lost earnings, and pain and suffering.[5]

---

4. Before the jury was evidence that the Aerostar's owner's manual directs drivers to apply the brakes firmly with one stroke and not in a pumping action. A single application of the brakes, according to the testimony, would not have exhausted the vacuum reservoir of the

power assist to the brakes, aiding Jarvis's ability to stop the vehicle.

5. For damages up to the date of the verdict, the jury awarded $24,568 in past medical insurance premiums, $340,338 in lost earn-

Ford moved under Fed.R.Civ.P. 50(b) for judgment as a matter of law, claiming that [t]he only logical conclusion that can be drawn from the evidence is that the plaintiff never applied the brake pedal during the accident, but mistakenly applied the accelerator. Alternatively, Ford claimed that the jury's verdict was inconsistent because Ford could not have negligently designed the cruise control if there was no defect in its design. Ford also moved to reduce the verdict by the amount of collateral source payments totaling $473,469 pursuant to N.Y.C.P.L.R. 4545. Finally, Ford asked the court to rule on its previously filed motion to dismiss plaintiff's punitive damages claim. The district court granted all of these motions and entered judgment for Ford. A few months after trial, Jarvis moved for relief from the final judgment under Fed.R.Civ.P. 60(b), alleging that Ford had engaged in fraud, misrepresentation, and misconduct by withholding from Jarvis and from the district court documents that the court had ordered to be produced, by making false claims, and by presenting false testimony. The district court denied the motion.

## DISCUSSION

### A. Ford's Motion for Judgment as a Matter of Law

█ Judgment as a matter of law is appropriate when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a). In ruling on a Rule 50 motion, "the trial court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens College,* 242 F.3d 58, 70 (2d Cir.2001) (internal citations omitted). We review the district court's grant of a motion for judgment as a matter of law *de novo, see Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000), applying the same standard that a district court must apply, *see LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995).

█ We hold that there was a legally sufficient evidentiary basis for a reasonable jury to find that Ford had negligently designed the cruise control of the 1991 Aerostar. Jarvis presented evidence which the jury could credit that her Aerostar suddenly accelerated without her depressing the accelerator and that she was not able to stop the Aerostar by pumping the brakes. This proof included her testimony, the testimony of other Aerostar owners who had experienced similar problems, and evidence that hundreds of additional Aerostar owners had reportedly experienced sudden acceleration. She also presented an expert who offered a theory to explain why the cruise control had malfunctioned causing the Aerostar suddenly to accelerate, and who proposed an inexpensive remedy for this problem. The district court found this expert testimony to be admissible in a *Daubert* hearing, and the jury was entitled to credit it. Ford presented evidence that identified weaknesses in this theory, principally that there was no physical evidence that the defects hypothesized by Jarvis caused the cruise control to malfunction and suggested that

---

ings, and $200,000 in pain and suffering. For future damages, the jury awarded $22,955 in medical insurance premiums, $648,944 in lost

earnings, and $300,000 for pain and suffering.

driver error had caused the accident. We hold, however, that neither Ford's evidence of the unlikely nature of the specific defect that Jarvis had posited nor Ford's theory that the accident had been caused by driver error so outweighed Jarvis's proof that no reasonable jury could find for Jarvis. In so holding, we recognize the settled principle of New York law that a plaintiff in a products liability action is not required to prove a specific defect when a defect may be inferred from proof that the product did not perform as intended by the manufacturer.

### 1. New York Law of Negligent Design

■ The New York Court of Appeals has established that "a manufacturer is obligated to exercise that degree of care in his plan or design so as to avoid any unreasonable risk of harm to anyone who is likely to be exposed to the danger when the product is used in the manner for which the product was intended." *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 348 N.E.2d 571, 577 (1976). The court explained that "[w]hat constitutes reasonable care will ... involve a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effect to avoid the harm." *Id.* at 577–78 (internal quotation marks omitted).

As applied to the facts of this case, the jury charge on negligent design restated this standard as comprising three elements: (1) that the cruise control system in the 1991 Aerostar was defective when put on the market by Ford; (2) that the defect made it reasonably certain that the vehicle would be dangerous when put to normal use; and (3) that "Ford failed to use reasonable care in designing the cruise control system or in inspecting it or testing it for defects, or that even though Ford used reasonable care in designing, inspect-

ing and testing the cruise control system in the 1991 Aerostar, that Ford learned of the defect before putting the product on the market and did nothing about it."

The New York Court of Appeals has held that a plaintiff's failure to prove why a product malfunctioned does not necessarily prevent a plaintiff from showing that the product was "defective." In *Codling v. Paglia*, 32 N.Y.2d 330, 345 N.Y.S.2d 461, 298 N.E.2d 622 (1973), a four-month-old car driven by Paglia suddenly and inexplicably drifted across the road's dividing line into oncoming traffic. *Id.* at 624. Chrysler, in defending the suit, stressed that Paglia had failed to prove any specific defect—emphasizing in particular the inadequacy of the plaintiff's post-accident tests to demonstrate a specific defect. *Id.* at 625. The New York Court of Appeals rejected this argument and upheld an instruction to the jury on breach of warranty that explained:

> While the burden is upon the plaintiff to prove that the product was defective and that the defect existed while the product was in the manufacturer's possession, plaintiff is not required to prove the specific defect, especially where the product is complicated in nature. Proof of necessary facts may be circumstantial. Though the happening of the accident is not proof of a defective condition, a defect may be inferred from proof that the product did not perform as intended by the manufacturer. . . .

*Id.* Accordingly, the Court of Appeals affirmed the jury's conclusion that "the steering mechanism of the automobile was not fit for the purpose for which it was intended." *Id.* at 338, 345 N.Y.S.2d 461, 298 N.E.2d 622.

A later New York Court of Appeals case similarly rejected the contention that a plaintiff injured by an exploding can of Freon had failed to make out a *prima*

*facie* breach of warranty claim when no particular defect in the packaged refrigerant was ever discovered. *Halloran v. Virginia Chemicals Inc.*, 41 N.Y.2d 386, 393 N.Y.S.2d 341, 361 N.E.2d 991 (1977). The court stated that

> if plaintiff has proven that the product has not performed as intended and excluded all causes of the accident not attributable to defendant, the fact finder may, even if the particular defect has not been proven, infer that the accident could only have occurred due to some defect in the product or its packaging.

*Id.* at 993.

The same principles hold in products liability actions brought under a theory of negligent design. *See, e.g., Gargano v. Rosenthal*, 100 A.D.2d 534, 473 N.Y.S.2d 225, 227 (2d Dep't 1984) (citing *Halloran* in finding that causes of action for products liability, including those under theories of negligence, breach of warranty, and strict liability, may be proven "through circumstantial evidence, by showing that the vehicle's transmission and gearshift did not perform as intended and by excluding all causes of the accident not attributable to [defendants'] conduct"); *Hunter v. Ford Motor Co.*, 37 A.D.2d 335, 325 N.Y.S.2d 469, 471 (3d Dep't 1971) ("[A]lthough in both actions in negligence and breach of warranty a plaintiff must come forward with evidence of a defect, existence of the causative defect is provable by circumstantial evidence. The precise defect need not be named and proved; it is sufficient if the cumulation of circumstances and inferences ... supports the conclusion that there was a defect which caused the accident."); *see also Sanders v. Quikstak, Inc.*, 889 F.Supp. 128, 131 (S.D.N.Y.1995) (citing *Halloran* in stating that to prove negligence, breach of warranty, and strict products liability under New York law, "[d]espite an absence of proof of any specific defect in a product, a jury may infer that an accident occurred because of a defect when the plaintiff has proven that the product did not perform as intended and has excluded all causes of the accident not attributable to the defendant").[6]

### 2. The District Court's Grant of Judgment as a Matter of Law

■ In granting Ford's motion for judgment as a matter of law, the district court relied upon the fact that Jarvis's expert had not established that the cruise control malfunctions he outlined were "substantially likely to occur or, even assuming they

---

**6.** For strict products liability, the Restatement (Third) of Torts similarly observes that a product may be found to be defective without proof of the specific malfunction:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
> (a) was of a kind that ordinarily occurs as a result of product defect; and
> (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

Restatement (Third) of Torts: Product Liability § 3 (1998). In comment c to this section, the Restatement notes:

> *No requirement that plaintiff prove what aspect of the product was defective.* The inference of defect may be drawn under this Section without proof of the specific defect. Furthermore, quite apart from the question of what type of defect was involved, the plaintiff need not explain specifically what constituent part of the product failed. For example, if an inference of defect can be appropriately drawn in connection with the catastrophic failure of an airplane, the plaintiff need not establish whether the failure is attributable to fuel-tank explosion or engine malfunction.

*Id.; see also* Restatement (Third) of Torts: Products Liability § 3 (1997 Main Volume Comments) (collecting cases that have followed this rule).

did, that the mechanical features of the car would not have overcome the resulting wide open throttle condition." *Jarvis v. Ford Motor Co.,* 69 F.Supp.2d 582, 599 (S.D.N.Y.1999). The court stated that Jarvis "has offered no evidence to suggest how frequently the design defect is likely to occur," *id.,* or "any evidence that the attenuated chain of events necessary to result in an accident is likely to occur, let alone with significant regularity." *Id.* at 600. Concerning the need for scientific proof of a defect, the court found that it is not

> sufficient for plaintiff to simply define away the need to present proof of its theory by suggesting that there will be no trace of the electrical events posited.... [I]n the absence of evidence, plaintiff cannot meet its burden to establish that its version of events is more probable than not. It is, in part, because of the necessity of an expert's explanation for the events at issue that we find it unreasonable to rely on the testimony of five other individuals who reported experiencing sudden accelerations in Ford Aerostars ..., as well as an even greater number of complaints (totaling 560) investigated by Ford and catalogued ... [of] alleged unintended acceleration incidents ..., as an adequate substitute for the presentation of a viable expert explanation of this incident.... In reaching this conclusion, we do not mean to suggest that similar act evidence may not be significant in other design defect cases or that the testimony of other incidents could not have been probative of plaintiff's credibility had plaintiff surpassed her initial hurdle of establishing that the "defect" was more than theoretical.

*Id.* at 601 n. 41.

### 3. Jarvis's Proof of Negligent Design

The district court erred in requiring proof of a specific defect in the Aerostar's cruise control and in not considering Jarvis's circumstantial evidence of a defect. The malfunction in the design of the Aerostar that Jarvis has alleged is that it suddenly accelerated, opening full throttle without Jarvis depressing the accelerator pedal, and that her efforts to stop the vehicle by pumping the brakes were unavailing. If Jarvis's six-day-old Aerostar performed in this manner, a jury could reasonably conclude that it was "defective when put on the market by Ford," and that "the defect made it reasonably certain that the vehicle would be dangerous when put to normal use," as required by the first two elements of the jury charge regarding negligent design. Although Ford argued that the accident was caused instead by driver error, this theory would have been rejected if the jury had believed Jarvis's testimony that she had her feet on the brake and not on the accelerator, as Ford claimed. The final element of the negligence charge asking whether Ford breached its duty of care, required "a balancing of the likelihood of harm, and the gravity of harm if it happens, against the burden of the precaution which would be effective to avoid the harm." *Micallef,* 384 N.Y.S.2d 115, 348 N.E.2d at 577. Construing the evidence in Jarvis's favor and crediting her version of events, a reasonable jury could find that Ford breached its duty of care. Even accepting as true that sudden acceleration in the 1991 Aerostar would occur, at most, very infrequently when measured against all Aerostar ignition starts, the consequences of sudden acceleration could easily be catastrophic, the design of which Jarvis complains has no particular utility to balance its potential for harm, and, according to Jarvis's expert, the malfunction in the cruise control could be avoided by an inexpensive switch that would shut off power to the cruise control when not in use.

A different case would be presented if Jarvis had been found unconscious in her overturned Aerostar, with no memory of or witnesses to the accident. In such a case, Jarvis would have to rely more heavily upon scientific evidence to demonstrate that the accident was caused by sudden acceleration. Our decision in *Fane v. Zimmer, Inc.*, 927 F.2d 124 (2d Cir.1991), relied upon by the district court, makes this precise distinction. The plaintiff in *Fane* needed to show, at the very least, that the plaintiff's internal injuries occurred after a medical device implanted in the plaintiff's hip broke. *Id.* at 131. Unlike Jarvis's in accident, we noted in *Fane* that "no one observed the accident in this case; and no one knows for sure how it happened." *Id.* Here, Jarvis offered testimony which a reasonable jury could believe to the effect that the Aerostar's sudden acceleration, not driver error, was the cause of her accident.[7]

4. The Sufficiency of the Evidence

The district court also found that, apart from the issue of scientific evidence of a specific defect, "there is such an overwhelming amount of evidence in favor of the defendant that reasonable and fair minded persons could not arrive at a verdict" in favor of Jarvis. *Jarvis*, 69 F.Supp.2d at 602. In support of this conclusion, the district court stated that testimony from Jarvis's own witnesses "de-monstrat[ed] essentially ... that the July 14, 1991 incident was not the result of plaintiff's sudden acceleration theory." *Id.* Specifically, the district court emphasized that (1) Jarvis offered no physical evidence of either the specific defect in the cruise control mechanism or of a defect in the "dump valve," and (2) Sero's theory that Jarvis's pumping of the brakes contributed to the accident was undermined by testimony by Jarvis's expert Pope.

Even though, as discussed above, the law does not require Jarvis to prove what specific defect caused the cruise control to malfunction, Ford conceivably could have offered scientific proof that the cruise control would not have malfunctioned in the manner alleged that so outweighed Jarvis's proof that it malfunctioned as to warrant judgment as a matter of law for Ford. This is not such a case. To explain why, we first examine the evidentiary value of Sero's theory and then address particular issues of fact that the district court resolved in favor of Ford but that we conclude were left open by the evidence and, accordingly, were matters for the jury to decide.

a. The Evidentiary Value of Sero's Theory

■ In its *Daubert* hearing, the district court fully analyzed Sero's proposed testi-

---

7. The other cases relied upon by the district court, taken from the fields of toxic torts and medical device malfunctions, involved the distinct issue, not present here, of the causal link between a defect or dangerous condition and the injury alleged. *Jarvis*, 69 F.Supp.2d at 592 (citing *In re Joint Eastern & Southern District Asbestos Litigation*, 52 F.3d 1124, 1133 (2d Cir.1995) (emphasizing the importance of scientific evidence in proving the causal link between construction workers' exposure to asbestos and the plaintiff's cancer); *In re "Agent Orange" Product Liability Litigation*, 611 F.Supp. 1223, 1262–63 (E.D.N.Y. 1985) (noting the difficulty in demonstrating a causal link between exposure to Agent Orange and diseases from which the plaintiffs suffered); *Gold v. Dalkon Shield Claimants Trust*, No. B–82–383, 1998 WL 351456, at *3 (D.Conn. June 15, 1998) (requiring expert testimony to establish a causal link between a defect in the Dalkon Shield and the plaintiff's alleged injuries)). In contrast, if Jarvis can establish that her Aerostar malfunctioned by suddenly accelerating, proving a causal link between the sudden acceleration and the ensuing accident is a relatively easy matter.

mony under the factors established by the Supreme Court and found the testimony admissible.[8] The jury was entitled to consider this evidence, even if it did not conclusively demonstrate—as it need not—what specific defect caused the Aerostar's cruise control to malfunction. The district court did not strike the *Daubert* testimony before evaluating Ford's motion for judgment as a matter of law or recant its *Daubert* findings in ultimately granting that motion. Nor has Ford appealed the results of the *Daubert* hearing. So we need not rule on the district court's *Daubert* findings. However, we briefly review those findings, as they help to illustrate the role of Sero's testimony within Jarvis's case presented at trial.

Under the first *Daubert* factor, the court found that "Sero has sufficiently tested and replicated" the theory of two independent faults—one of the ground of the cruise control servo and another of the vent and/or vac wires. *Jarvis*, 1999 WL 461813, at *4. The court was satisfied that Sero's findings "have been sufficiently verified through repeated tests on a model that accurately reflects the relevant electrical components on the 1991 Ford Aerostar." *Id.* The court further noted that Ford did not dispute that "Sero's manipulation of the cruise control components can result in sudden, unintended acceleration," and argued only that Sero had never observed the same results "in the real world." *Id.* Meanwhile, the court was careful to exclude another of Sero's theories that did not satisfy this first prong of the *Daubert* test. *Id.* at **4–5.

As to the second *Daubert* factor, the court held that even though Sero's findings had been neither published nor peer reviewed, this alone was not a sufficient reason to exclude Sero's testimony. *Id.* at *6.[9] The district court dismissed criticisms under the third *Daubert* factor that these theories had not been tested for their rate of error. In this regard, the court stated that Sero was not "proposing to testify as to the likelihood that a malfunction in the cruise control caused [Jarvis's] accident." Rather, the court pointed out:

> Sero is proposing to testify that the design of the 1991 Aerostar makes it physically possible for this malfunction to occur, and wishes to demonstrate to the jury how it can happen. Plaintiff presumably will seek to establish specific causation either through its accident reconstructionist or by attempting to draw inferences from the circumstantial evidence.

> Unlike the more typical case in which an expert testifies to specific causation and uses a statistical sampling method to determine the likelihood of the event occurring in the particular case, here plaintiff's expert proposes to testify about general causation and relies on modeling and a fault analysis to demonstrate known physical and electrical principles....

8. The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), stated that a trial court's decision whether to admit into evidence a proffered expert theory should ordinarily weigh (1) "whether it can be (and has been) tested," *id.* at 593, 113 S.Ct. 2786; (2) whether it "has been subjected to peer review and publication," *id.*; (3) its "known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation," *id.* at 594,

113 S.Ct. 2786; and (4) its general acceptance, which "can," *id.*, have a bearing on theory's "evidentiary reliability—that is, trustworthiness," *id.* at 590 n. 9, 113 S.Ct. 2786 (emphasis omitted).

9. Jarvis explains the lack of publication or peer review as understandable because Sero was the first to "crack the code" as to the causes of sudden acceleration. *Id.* at *5.

Defendant's dispute with Sero's ... findings lies not in their possibility, but in the likelihood that such conditions will occur in the "real world." .... Disputes over the conclusions that can be drawn from the results of Sero's modeling analysis is properly the province of the jury.

*Id.* at **6–7.

Turning to the fourth *Daubert* factor, which tests the degree to which the expert's technique has been generally accepted in the scientific community, the district court observed that Ford "does not specifically challenge Sero's methodology." *Id.* at *6. Sero claimed to have used "failure mode analysis" on the 1991 Ford Aerostar cruise control system, a "standard approach" to evaluating the design of a component. *Id.* The district court concluded that Ford "has not asserted that Sero's approach lacks support in the engineering community and we have no reason to believe such a technique is unreliable." *Id.*

The court next addressed a 1989 report prepared by the National Highway Traffic and Safety Administration ("NHTSA") finding that the occurrence of the two independent electrical failures, as suggested by Sero, "is virtually impossible." *Id.* at *8. The court noted that the NHTSA may not have recognized that sudden acceleration could be caused, under Sero's theories, from a dead stop, and that because the court did not have further evidence as to the basis of the NHTSA's conclusions, it would not exclude Sero's testimony solely on the basis of the contrary conclusion reached by the NHTSA. *Id.* at *9.

The court recognized that Jarvis's inability to offer physical evidence from the accident in support of the specific defects Sero discussed could affect the weight the jury gave to these theories. The court concluded, however, that this fact did not affect the admissibility of these theories to explain the specific defect that caused Jarvis's Aerostar to accelerate because, "it is basic ... to Sero's theory that there will be no physical evidence that the electrical events occurred." *Jarvis*, 69 F.Supp.2d at 595.[10] What weight should be given to this evidence remained for the jury to decide.

### b. The Loss of Braking Power

Jarvis also presented evidence at trial that sudden acceleration not only would open the throttle to her Aerostar but also would decrease significantly her ability to restrain the vehicle by pumping the brakes. Pope, Jarvis's expert, testified that the Aerostar had vacuum power brakes that draw their vacuum from the engine. When accelerating at full throttle, Pope testified, the engine does not create the normal vacuum that assists in braking. An additional reservoir of vacuum could be depleted by pumping the brakes, as Jarvis testified she did in this case. The expert concluded that "under those circumstances [ ]it will feel to a person like they've lost their brakes, they're pushing and nothing is happening."

Calling this theory into question when ruling on Ford's motion for judgment as a matter of law, the district court pointed to testimony by Pope on cross-examination acknowledging that, assuming that the dump valve was working properly and that it would engage when the brake pedal was depressed approximately half an inch, in a "normal pumping phase, the dump valve is always going to be open, so you are never

---

**10.** Although the district court later characterized its admission of Sero's theories into evidence as "based on plaintiff's representation that they would be connected by direct and circumstantial evidence to the accident at issue," *Jarvis*, 69 F.Supp.2d at 594 n. 19, we have found no indication that the jury was instructed to disregard Sero's theory because of Jarvis's inability to prove certain facts.

going to be out of vacuum assist." *Jarvis,* 69 F.Supp.2d at 598. Construing the evidence in the light most favorable to Jarvis, Pope's statement does not establish whether he was referring to a single depression of the brake pedal or how long he assumed the pedal was depressed. These additional factors are crucial for determining when Jarvis's brakes would exhaust the vacuum reservoir making it difficult to slow the vehicle. Admittedly, no record exists of how many times Jarvis pumped the brakes, how long each stroke lasted, or how far she depressed the pedal in each stroke. Such a record would allow a more exact analysis of how the depletion of the vacuum reservoir may have been counterbalanced by the engine replenishing the vacuum, if the dump valve were functioning properly and the sudden acceleration were interrupted every time the brake pedal was depressed. Given the absence of this information and the uncertainty as to the context of Pope's comment, we do not view this isolated portion of Pope's testimony as discrediting other testimony in the record concerning the detrimental effect of pumping the brakes on the ability to stop a vehicle accelerating at full throttle.

### c. The Dump Valve

The district court also relied on a second statement by Pope as establishing that any sudden acceleration would have been prevented or terminated by the Aerostar's dump valve. *Jarvis,* 69 F.Supp.2d at 597–99. When read in context, this statement does not support the determinative weight assigned by the district court. The court called attention to the fact that Pope agreed that, assuming the dump valve was working properly, "if the brakes were applied at all, the dump valve would have been open." This evidence, the district court noted, "undermines plaintiff's own version of the accident, which was that she

started the car with her foot on the brakes, and that with her foot on the brake, the car accelerated." *Jarvis,* 69 F.Supp.2d at 597. In his testimony, however, Pope qualified this statement as contingent upon the assumption that Jarvis, when starting the van, had depressed the brake pedal far enough to engage the brakes. The proceeding exchange during cross-examination provides the necessary background for his remarks.

> Question: If [Jarvis] said she had her foot depressed on the brake and the vehicle took off as she pushed on the brake and the vehicle was at a standing stop, unless there was something wrong with the dump valve, do you agree that she was wrong on that?
>
> Pope: She would have been pushing not with her full might at that point?
>
> Question: I'm sorry?
>
> Pope: I don't believe she was pushing with all her effort at that point. The vehicle would have moved forward, yes.
>
> Question: Sir, if the brakes were applied at all, the dump valve would have been open, wouldn't it?
>
> Pope: Yes.

A fact finder could reasonably conclude from this exchange that Pope was attempting to distinguish between two types of depression of the brake pedal. Jarvis testified that she put her "[r]ight foot lightly on the brake" as she started the engine. If Jarvis had not depressed the brake pedal far enough, the dump valve might not have opened, and the Aerostar could have accelerated suddenly as Jarvis claimed. This light application of the brakes is distinguished in Jarvis's testimony from her later act of placing both feet on the brake pedal and depressing it with considerable force after the vehicle began to accelerate, an action that would have opened the

dump valve, assuming that it was functioning properly.

The district court also noted that Pope had agreed on cross-examination that if Jarvis "was pumping the brake under ordinary pumping, the dump valve would have remained open, and the vehicle would have stopped." *Jarvis,* 69 F.Supp.2d at 598. On this basis, the court concluded that "Pope's testimony ... totally undermined Sero's hypothesis that this accident occurred because plaintiff pumped the brakes rather than applying steady pressure." *Id.* As in Pope's testimony discussed above concerning the vacuum reservoir, Pope was not asked to comment on the interaction between a properly functioning dump valve, the decrease in vacuum pressure when pumping the brakes, and the sudden acceleration described by Sero. The parties appear to agree that every time the brake pedal was released in the pumping action even a properly functioning dump valve would close and allow the Aerostar suddenly to accelerate anew under Sero's theory.

Finally, as previously emphasized, all of this testimony concerning the dump valve presupposes that it was functioning properly at the time of Jarvis's accident. If the dump valve had malfunctioned, the sudden acceleration described by Sero would have continued, despite Jarvis's depressing the brake pedal, even with both feet applying considerable force. DeClercq, Ford's expert, testified that he tested the dump valve after the accident and found that it functioned properly at that time. Undeveloped in the record, however, is discussion of the possibility that a defect in the dump valve could cause it to malfunction in a manner that would not have been evident upon DeClercq's later examination.

Examining the record as a whole, and construing the evidence in the light most favorable to Jarvis, we cannot say, as a matter of law, that the fact that the Aerostar was equipped with a dump valve discredits Sero's testimony in the manner found by the district court.

#### d. Ford's Theory of the Accident

The district court also found that Ford had "proffered an alternative scenario that was consistent with the evidence offered by third parties and received support from plaintiff's own witness Pope and the NHTSA governmental study." *Jarvis,* 69 F.Supp.2d at 602. Ford's scenario suggests that Jarvis, unfamiliar with her new minivan, started it

> unaware that her father had set the parking brake ..., put her foot on the accelerator thinking it to be on the brake, and was startled when the engine started to race against the force of the parking brake. Continuing to believe that her foot was on the brake and not on the accelerator, plaintiff was unable to stop the car.

*Id.*

The record as a whole, viewed in the light most favorable to Jarvis, supplies little evidence to support Ford's theory of the accident. While we agree that some evidence in the record is consistent with this theory, judgment as a matter of law demands far more. *See* Fed.R.Civ.P. 50(a) (requiring for judgment as a matter of law that "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the non-moving] party on that issue"). Balancing the evidence that supports Jarvis's sudden acceleration theory against the evidence that calls this theory into question, we do not find the evidence so favorable to Ford as to warrant judgment as a matter of law. To demonstrate this, we begin by analyzing the evidence that the district court collected in support of Ford's theory.

*The Parking Brake.* The district court stated that Jarvis's father testified "that he set the parking brake." *Jarvis*, 69 F.Supp.2d at 602. This misconstrues the record. Jarvis's father, who had been the last one to use the van before the accident, testified that although it was his "normal habit" to put on the parking brake, particularly when it was on a slight incline, he had "no memory of it as such" in this case. When asked specifically whether he had set the brake before the accident, he answered, "I'm not certain I put it in with the parking brake on."

*The Brake Light.* The district court indicated that Jarvis testified "that she saw the word 'brake' lighted on the dashboard, which according to Pope means that the parking brake is set." *Id.* at 603. This reading of the record fails to construe the facts in favor of Jarvis as required when ruling on a motion for judgment as a matter of law. Jarvis testified that she saw a white or light yellow light illuminated high on the left of the dashboard and stated, "as I'm recalling[,] it said brake." Asked specifically if she had seen a red light illuminated on the panel from the beginning to the end of the incident, she answered no. Pope testified that the Aerostar had two instrument panel lights related to the braking system. The parking brake light, located on the right lower portion of the dash, was red and said "brake." The rear anti-lock brake light, located on the upper left corner of the dash, was amber and would be illuminated for two seconds after the ignition is turned on and the van moves forward while the system reviews its components. Although Jarvis's statement that the light said "brake" is consistent with the parking brake being set, the placement of the light, its color, and the fact that it was not illuminated during the course of the entire incident all indicate that Jarvis saw the rear anti-lock brake light, not the parking brake light, illuminated.

*The Speedometer.* The district court noted that the fact that Jarvis saw the speedometer "going up" was inconsistent with DeClercq's testimony that a loose ground wire—required under Sero's theories—would have caused the speedometer to read zero during the sudden acceleration. *Id.* Jarvis did not present any evidence to rebut DeClercq's claim on this matter.

*The Rear Brake Lights.* The court also called attention to Joanne Valentine–Simonian's testimony that "she saw no rear brake lights illuminated on plaintiff's vehicle when it passed her." *Id.* This statement fails to provide the context for Valentine–Simonian's statement, which affects its reliability. Valentine–Simonian testified that she ran toward the woods when she saw the Aerostar moving quickly down the road in her direction and then looked back to see the van pass, acknowledging that she had "jumped" out of the way.

*The Absence of Skid Marks.* A police officer investigating the accident testified that he saw no skid marks on the gravel driveway. This evidence, according to the district court, showed that Jarvis had not placed her foot "forcefully" on the brake. *Id.* As discussed above, however, the depletion of the brake vacuum reservoir by Jarvis's pumping the brakes would have resulted in diminished braking power regardless of the force with which Jarvis depressed the brake pedal. Pope suggested that the depletion of the vacuum reservoir by Jarvis's pumping the brakes could explain in an absence of skid marks. Moreover, Pope testified that under Ford's theory that the parking brake was on and Jarvis had pumped the accelerator instead of the brake, "[i]t's possible that [the Aerostar] would have left skid marks."

*The Engine Racing.* The court observed that, according to Pope's testimony, if the parking brake were on, pumping the accelerator "would have resulted in the engine racing sound that plaintiff and Valentine–Simonian reported." *Id.* While true, the sound of the engine racing is equally consistent with the sudden acceleration explained by Sero's theory.

On the same topic, the court noted that Pope agreed that the cessation of the revving sound described by Valentine–Simonian "could have indicated that plaintiff had taken her foot off the accelerator ..., which would also explain the slowing of the vehicle." *Id.* Again, while true, the same evidence is equally consistent with Jarvis's testimony that she was pumping the brake.

*Jarvis's Ability to Stop the Aerostar.* The district court claimed that the testimony supported the conclusion that Jarvis would have been able to stop the Aerostar if she had pumped the brakes. *Id.* As discussed above, the pumping action itself could have depleted the vacuum reservoir, diminishing Jarvis's ability to stop the vehicle.

*The "Park" Mechanism.* The district court also noted Jarvis's testimony that she recalled the Aerostar being in "park" when it accelerated. *Id.* at 597 n. 31. All parties agree, however, that the Aerostar did accelerate. Therefore, either Jarvis was mistaken that the Aerostar was in "park" when it accelerated, or the "park" mechanism failed. Either way, the reason for the acceleration and Jarvis's inability to stop the Aerostar is unaffected. Furthermore, Ford's explanation for the accident would be similarly undermined by testimony that the Aerostar was in "park" when it accelerated, rendering this issue even less significant.

■ *The NHTSA Report.* Finally, the district court stated that "[t]he reasonableness of Ford's position was supported,

both generally and in certain specifics" by the NHTSA report. *Id.* We agree, however, with the district court's earlier conclusion following the *Daubert* hearing that differing conclusions in the NHTSA report did not affect the admissibility of Sero's theories to prove the cause of Jarvis's accident. *Jarvis,* 1999 WL 461813, at *9. The weight given to conclusions in the NHTSA report, as compared to those of Sero, was a matter for the jury to decide.

The district court, meanwhile, failed to discuss the evidence in the record that weighs heavily against Ford's theory of driver error. Ford's theory that Jarvis had the parking brake on and applied her foot to the accelerator instead of the brake is irreconcilable with Jarvis's testimony that she began with her foot "lightly"on the brake and that the Aerostar's acceleration was sudden. If her foot was placed "lightly"on the accelerator instead of the brake, and the parking brake were on, the Aerostar would have accelerated slowly, if at all. Jarvis on the other hand, testified that the Aerostar "took off." Another weakness of Ford's theory is that it assumes driver error not only as to which pedal Jarvis depressed but also as to the effect of each stroke of the pedal. Under Ford's theory, Jarvis would have felt the Aerostar *accelerate* with each application of the pedal, and slow each time she lifted her foot from the pedal. Ford's theory asks us to believe that Jarvis repeatedly applied force to the pedal without understanding the effect of her actions. Finally, Ford's theory is unable to account for Jarvis's claim that she depressed the pedal with both feet. As part of the accident reconstruction, Jarvis was asked to sit in the Aerostar and to place both feet on the accelerator. She was able to do so only by placing one foot on top of the other. When asked to do the same with the brake pedal, she found that it accommodated both feet.

The jury viewed photos taken for purposes of this litigation showing *Jarvis* sitting in the Aerostar at the accident site. The photos also demonstrated that, when asked to put both feet on the accelerator, Jarvis had one foot placed over the other.

In sum, we find the ultimate issue of Ford's negligence to be a jury question. Ford did not present evidence that conclusively demonstrated, as a matter of law, that Jarvis's accident did not occur because of a defect in the Aerostar's cruise control mechanism. Jarvis's testimony, the testimony of other Aerostar owners who had similar experiences, and evidence of hundreds of other reported cases of sudden acceleration in Aerostars, combined with an expert's scientific explanation of how the cruise control may have malfunctioned and of an inexpensive remedy, were all found admissible by the district court. Together, this evidence provided the jury with a sufficient evidentiary basis to reasonably conclude that the cruise control mechanism had been defectively designed.

## B. Ford's Inconsistent Verdict Motion

### 1. Background

Immediately after the jury returned its verdict but before the jury was excused, Ford moved for relief on the basis of an inconsistent verdict. The district court agreed with Ford that the jury verdict was "irreconcilable," *Jarvis*, 69 F.Supp.2d at 588, but did not reach the issue of what relief would be appropriate because, as discussed above, it found the evidence insufficient to sustain a verdict for Jarvis and granted Ford's motion for judgment as a matter of law.

We find that any potential error related to the jury instructions and verdict sheet, and not to the jury's general verdicts and that, therefore, Ford's objection needed to conform to the strictures of Fed.R.Civ.P. 51. We hold that the district court, in finding that Ford had not waived its objection, erred, as a matter of law, in not applying the Fed.R.Civ.P. 51 requirements that any objection must "stat[e] distinctly the matter objected to and the grounds of the objection." Applying this legal standard, we find that Ford's pre-trial statement that the court should charge either negligence or strict liability, but not both, failed to alert the court to the precise nature of Ford's objection and its legal grounding. Finding no "fundamental error" in the instructions, we order the district court to reinstate the jury verdict.

The charge given to the jury explained that

"[p]laintiff brings this action on the basis of two theories of liability: Negligence and strict liability . . . .

. . . .

If you find that the cruise control system in the Aerostar was not defective *and* that Ford was not negligent, you will not reach the issues raised in the remainder of the charge.

If, however, you find *either* that Ford was negligent in the design of the 1991 Aerostar cruise control system, *or* that the 1991 Aerostar cruise control system was itself defective, you must next consider whether that negligence or defect was a substantial factor in causing plaintiff's injury . . . . If you find that *neither* defendant's negligence *nor* the cruise control defect was a substantial factor in causing the injury, then plaintiff may not recover.

If you find that *either* defendant's negligence *or* the cruise control defect was a substantial factor in causing plaintiff's injury, you will proceed to consider comparative fault . . . .

If you find *either* defendant's negligence *or* the cruise control defect was a substantial factor in causing plaintiff's

injury, you must next consider whether the plaintiff was also negligent." (emphasis added).

From this charge, it is abundantly clear that the jury was instructed that it could find Ford liable under theories of *either* negligence *or* strict liability or both. The verdict sheet given to the jury accurately reflected this by indicating, after question 1(a) concerning strict liability,[11] "IF YOUR ANSWER TO QUESTION 1(a) IS 'NO', THEN PROCEED TO QUESTION 2(a)." Question 2(a), concerning negligence, asked, "Do you find by a preponderance of the evidence that the defendant Ford Motor Company was negligent in the design of the cruise control system in the 1991 Ford Aerostar? (Plaintiff's Burden of Proof)," followed by blanks to check either "yes" or "no." The jury checked the "no" blank in response to question 1(a), and "yes" in answer to question 2(a).

After the jury returned its verdict, and as the court was thanking its members for their service, counsel for Ford stated:

> Your Honor, ... I must make a motion for an inconsistent verdict before the jury is dismissed and I'm doing that at this point in time. And the basis for that motion is by finding "no" on Question 1A that the cruise control was not designed in a defective manner, the jury cannot then find that Ford was negligent in the design of the cruise control system. The opposite would be so, but it can't be so in that direction.

Counsel for Jarvis argued that the verdict was rendered in accord with the jury charge. The court responded that it had believed it necessary to charge both theories of liability, despite its reservations, because it found no case law permitting the court to eliminate one of the claims

from the charge. The court then refrained from dismissing the jury and asked for written submissions from the parties on the issue of the inconsistency in the verdict. The court subsequently granted Ford's motion, finding the verdict inconsistent. *Jarvis,* 69 F.Supp.2d at 586, 588.

Ford argues that it did not waive its objection to any inconsistency in the verdict because (1) it objected to the verdict after it was announced but before the jury was released; (2) counsel for Jarvis acknowledged that Ford's motion was timely; and (3) Ford had voiced its opposition to charging both theories before trial. The district court ruled only on the third contention, finding that Ford's pre-trial statements adequately preserved its objection. In reviewing *de novo* the district court's choice of legal standard, we hold that it did not apply the correct standard in ruling that Ford was relieved from the obligation of presenting a more explicit, precise, and reasoned objection before the jury deliberated. Applying the correct standard, we find that Ford did not satisfy the requirements of Fed.R.Civ.P. 51. Ford's first two contentions, not addressed by the district court, both fail because they appear to rely on Fed.R.Civ.P. 49, which is inapplicable in this case.

### 2. Fed.R.Civ.P. 49

On appeal, Ford first contends that its objection was timely because it was made before the jury was released. Although Ford cites no authority for this proposition, we assume that it relies on Fed.R.Civ.P. 49, governing special verdicts and interrogatories. Under Rule 49(a), a "court may require a jury to return only a special verdict in the form of a special

---

**11.** The first question asked, "1(a) Do you find by a preponderance of the evidence that the cruise control system of the 1991 Ford Aeros- tar was designed in a defective manner? (Plaintiff's Burden of Proof)," followed by blanks to check either "yes" or "no."

written finding upon each issue of fact," with objection to the omission of any issue of fact made before "the jury retires." Fed.R.Civ.P. 49(a). This rule does not apply when, as here, the jury is required to make determinations not only of issues of fact but of ultimate liability. *Cf. Barrett v. Orange County Human Rights Comm'n,* 194 F.3d 341, 349 (2d Cir.1999) (refusing to apply Fed.R.Civ.P. 49(a) when "the alleged error was not the omission of an issue from the verdict form" but rather in the *"instruction* provided on the verdict form") (emphasis in original); James Wm. Moore et al., *Moore's Federal Practice* ¶ 49.02[2][b] (3d ed. 1998) ("Pursuant to Rule 49(a), the jury returns its special verdict in the form of written answers to separate questions concerning specific factual issues. The trial court then applies the law to those answers and enters judgment accordingly."). The dissent maintains that the verdict form may be seen as soliciting special verdicts under Rule 49(a), noting that the form was actually labeled "special verdict." *Post,* at 67. We have held, however, that where a jury is instructed to apply legal principles and assign liability, "the answers to the questions submitted to the jury are not special verdicts, despite the use of those words in the title appended to the form, and Rule 49(a) therefore does not apply." *Lavoie v. Pac. Press & Shear Co.,* 975 F.2d 48, 54 (2d Cir.1992).

Neither is Ford's objection proper pursuant to Fed.R.Civ.P. 49(b). Under Rule 49(b), a "court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict." Fed.R.Civ.P. 49(b). If the answers to the interrogatories are "inconsistent with each other and one or more is likewise inconsistent with the general verdict,"

the court may return the verdict to the jury or order a new trial. *Id.* Although an objection under Rule 49(b) to answers to the interrogatories may be timely if made before the jury is dismissed, Rule 49(b) is inapplicable here because the alleged inconsistency was not among responses to interrogatories regarding "issues of fact," but between two general verdicts based on different legal theories. The dissent contends that these cannot be general verdicts, because a general verdict asks only the question of ultimate liability, and there cannot be more than one question of ultimate liability in a single cause of action. *Post,* at 66. However, as the dissent appears to concede, *id.* at 66 n. 1, and as Ford seems to concede by not invoking Rule 49, our precedent clearly holds otherwise. *See Lavoie,* 975 F.2d at 54 ("[T]he alleged inconsistency to which defendant points is between two *general verdicts* on different legal theories and not between a general verdict and responses to interrogatories. Hence, the instruction given to trial courts under Rule 49(b) has no application.") (emphasis in original).

The statement by Jarvis's counsel that the "motion is not untimely," therefore, is of little consequence. Though a motion under Fed.R.Civ.P. 49 might have been *timely,* it cannot, as a matter of law, provide any relief for a party challenging a conflict between general verdicts based on an instruction given in the jury charge and repeated on the verdict sheet.

### 3. Fed.R.Civ.P. 51

Objection to an inconsistency between two general verdicts that is traced to an alleged error in the jury instruction or verdict sheet is properly made under Fed.R.Civ.P. 51. Yet to avail itself of relief under this Rule, a party must object before the jury retires to deliberate. *See* Fed.R.Civ.P. 51 ("No party

may assign as error the giving or the failure to give an instruction unless the party objects thereto before the jury retires to consider its verdict."). We have previously emphasized that "[f]ailure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection.... Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions." *Lavoie*, 975 F.2d at 55; *see also Barrett*, 194 F.3d at 349 (applying Rule 51 to an objection to an instruction provided on the jury form); *cf. Play Time, Inc. v. LDDS Metromedia Communications, Inc.*, 123 F.3d 23, 29 n. 6 (1st Cir.1997) ("The Rule 51 standard applies to the jury charge and any special verdict form."). In this case, Ford objected to the jury considering its liability under a negligence theory in question 2(a) after the jury had found Ford not strictly liable under question 1(a). This was explicitly permitted by the jury form that required that "IF YOUR ANSWER TO QUESTION 1(a) IS 'NO', THEN PROCEED TO QUESTION 2(a)." As noted above, the same procedure was required by the charge to the jury instructing that Ford's ultimate liability depended on the jury's finding "*either* that Ford was negligent in the design of the 1991 Aerostar cruise control system, *or* that the 1991 Aerostar cruise control system was itself defective." (emphasis added). We find, therefore, that Ford's objection made after the jury returned the verdicts was untimely.

Ford also contends that it did not waive its objection to verdict inconsistency because, before the trial began, it "made clear its position that the case should not go to the jury on both theories" of liability. Ford claims that once the district court, knowing Ford's preference for charging one but not both theories of liability, decided to send the case to the jury under theories of both negligence and strict liability, Ford was not required to object to the jury instructions or the verdict sheet because it was reasonable to conclude that further objection would be unavailing, echoing the district court's finding that no further objection was necessary. We disagree. At no point in its ruling on Ford's preservation of its objection did the district court consider whether Ford had satisfied the appropriate legal standard that Ford "stat[e] distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. We find that Ford did not, and note that the district court's own comments lead to the same conclusion.

### a. Factual Background

In their proposed jury instructions submitted prior to trial, both Ford and Jarvis requested that the court charge the jury on both negligence and strict products liability.[12] After receiving the parties' proposed requests to charge, the judge wrote to the parties asking them to "clarify their positions with respect to the appropriate causes of action in this case." Letter from Judge Buchwald to the parties, July 6, 1999, at 2. The court inquired, *inter alia*, whether "it would be sensible" to follow the approach taken in *Pahuta v. Massey–Ferguson, Inc.*, 170 F.3d 125, 134–35 (2d Cir.1999), "in which the plain-

---

**12.** Ford requested a standard negligence charge, following New York Pattern Jury Instruction 2:120, asking the jury to decide whether Ford had "failed to use reasonable care in designing or making the Aerostar van," and a standard strict liability charge, following New York Pattern Jury Instructions 2:141, stating that "[a] manufacturer who sells a product in a defective condition is liable for injury which results from use of the product when the product is used for its intended or reasonably foreseeable purpose."

tiff withdrew his negligence cause of action as duplicative of his strict liability claim," stating that the court's research "indicates a substantial overlap in the elements of negligence and strict liability claims for defective design." Letter from Judge Buchwald to the parties, July 6, 1999, at 1–2.

Counsel for Jarvis responded that "we do not regard the negligence claim and the strict liability claim as duplicative but, rather, we regard them as distinct, unlike the apparent factual situation referenced in *Pahuta v. Massey–Ferguson, Inc.*" Letter of George N. Tompkins, Jr. to Judge Buchwald, July 6, 1999, at 2. The letter explained that "[t]his claim raises the question whether the defendant Ford acted reasonably in selecting the design for the Aerostar cruise control system, whereas the strict liability claim focuses upon the question whether the Aerostar cruise control system itself was unreasonably dangerous." *Id.*

Counsel for Ford, in its letter to the district court, responded only that "[w]e have read the *Pahuta* case and agree with the Court that the Court should charge either negligence or strict products liability, but not both." Letter of Brian P. Crosby to Judge Buchwald, July 7, 1999, at 1. The letter offered no legal argument or citation to any other authority as to why both theories could not be charged. *Id.* The *Pahuta* case itself does not state that the two causes of action are necessarily duplicative. There, we mentioned in a footnote merely that "[a]t the charging conference, *Pahuta* abandoned a negligence cause of action as duplicative of his strict liability claim." *Pahuta,* 170 F.3d at 134 n. 7. The parties appear to agree, with

good reason, that our footnote in *Pahuta* did not decide the issue of the potential overlap of the two theories of liability for all future design defect claims brought under New York law. Tellingly, in arguing on appeal that the causes of action are duplicative as a matter of law, Ford makes no mention of *Pahuta.*

A few days after this exchange of letters, the parties met with Judge Buchwald in a pre-trial conference. There, Judge Buchwald began the discussion of the jury charge by stating: "I don't believe that there's any authority that I'm aware of that would permit a court over the objection of a plaintiff to not charge negligence or not charge strict liability if the plaintiff wants them both charged. So since you want them both charged, I'll charge them." Pre-trial conference, July 12, 1999 tr. ("Pre-trial tr."), at 27–28. Next, Judge Buchwald addressed a separate issue, raised in the prior correspondence, of Jarvis's failure to warn claim and whether it was part of either the negligence or strict liability claims. Pre-trial tr. at 28. In response, a speaker unnamed in the transcript but identified by Jarvis as "counsel for Ford"[13] stated: "To me, it seems that the claim of the plaintiff here is one of negligence and certain product liability." Later discussion of the duty to warn contains the comment by an unidentified speaker, again identified by Jarvis as "counsel for Ford" as first stating: "[T]hat gets negligence out of the case, as I see it. I mean, it's a product liability theory, plain and simple." Pre-trial tr. at 36. The court responded, "So you don't want me to charge negligence?" *Id.* The speaker, identified by Jarvis as "counsel for Ford," answered: "Well, we're going to reserve

---

**13.** The transcript of the pre-trial conference labels this individual only as an "UNIDENTIFIED SPEAKER." Pre-trial tr. at 30. The copy of the transcript supplied to this Court by Jarvis, however, contains handwritten notations identifying this speaker as "counsel for Ford." *Id.*

on that. *We want you to leave negligence in for now." Id.* (emphasis added). The judge agreed. *Id.*

After the charge to the jury, Ford did not object to instructing the jury on both theories of liability or to the instruction in the jury charge and on the verdict sheet that the jury could find Ford negligent but not strictly liable. The district court, in later finding that Ford had not waived its objection, stated that:

> Although it is true that defense counsel did not specifically object to our charge and special verdict questions on the ground that they could lead to inconsistent results, we cannot find a waiver because the defense's fundamental position on this issue had previously been expressed to the Court and, after our ruling at the pretrial conference, it was reasonable for defendant to conclude that future efforts to object would be unavailing.

*Jarvis,* 69 F.Supp.2d at 589.

Future efforts to object were, however, availing. After the jury returned its verdict, counsel for Ford objected, and, after explaining the legal basis for its claim that the two causes of action were duplicative, the district court agreed. *Id.* Citing *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730, 735–36 (1995), the court found a "functional equivalence" between the negligence and strict liability design defect claims. As a result, the court concluded that "defendant's position that a finding of no defect and a finding of negligence are inconsistent as a matter of law in a product liability case is well supported." *Jarvis,* 69 F.Supp.2d at 586. Later reflecting on what had occurred before and during the trial, the district court stated:

> While we readily admit that our pretrial research failed to learn of the wide acceptance of the equivalency of negli-

gence and strict liability claims in design defect cases, we remain puzzled why this overlap was not brought to our attention given that defendant's attorney was also of counsel to defendant Ford in the *Denny* case. Although we are lacking in hard evidence, we similarly doubt whether plaintiff's three experienced counsel shared our unfamiliarity with this case law. Thus, we suspect that both sides elected for strategic reasons to refrain from informing us of the overlap and potential for inconsistent verdicts. Regardless, we analyze this case in conformity with the now-revealed governing case law.

*Jarvis,* 69 F.Supp.2d at 587 n. 8.

### b. Standard of Review for Waiver Finding

■ We review *de novo* the district court's interpretation of the legal standard for waiver under Fed.R.Civ.P. 51. *See Pullman–Standard v. Swint,* 456 U.S. 273, 287, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982) (stating that "if a district court's findings rest on an erroneous review of the law, they may be set aside on that basis" and are not given the deference accorded to findings reviewed for clear error); *Unicorn Tales, Inc. v. Banerjee,* 138 F.3d 467, 468 (2d Cir.1998) (reviewing *de novo* district court's legal interpretation of civil procedure rule). We hold that the district court failed to apply the correct legal standard in ruling that the expression of Ford's "fundamental position" sufficed to preserve its objection to the jury instruction and verdict sheet. The district court neither mentioned Fed.R.Civ.P. 51 or its requirements nor applied them in substance. Applying the requirements of Fed.R.Civ.P. 51 *de novo,* we find that Ford waived any objection.

### c. The Law of Waiver Under Fed.R.Civ.P. 51

Under Rule 51, an objection must "stat[e] distinctly the matter objected to and the grounds of the objection." Fed. R.Civ.P. 51. "The purpose of the Rule is to allow the trial court an opportunity to cure any defects in the instructions before sending the jury to deliberate." *Fogarty v. Near N. Ins. Brokerage, Inc.*, 162 F.3d 74, 79 (2d Cir.1998). The "objections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error." *Palmer v. Hoffman*, 318 U.S. 109, 119, 63 S.Ct. 477, 87 L.Ed. 645 (1943); *see also Martin v. United Fruit Company*, 272 F.2d 347, 349 (2d Cir.1959) (requiring that an objection "be specific enough to inform the trial judge of his alleged error so that he may have an opportunity to correct it") (internal quotation marks omitted).

The "fundamental" nature of Ford's position that the court should have charged negligence or strict liability but not both is called into doubt by Ford's own recommendation, made only a few days before taking this position in correspondence with the court, that the district court charge both theories. Ford's position that it believed that one but not both causes of action should be charged was taken only after Judge Buchwald asked the parties whether "it would be sensible" to follow the approach taken in *Pahuta*, 170 F.3d at 134–35, "in which the plaintiff withdrew his negligence cause of action as duplicative of his strict liability claim." *Id.* Counsel for

Jarvis declined the offer, claiming that *Pahuta* was limited to its facts and that, in this case, the two theories of liability were not duplicative. Letter of George N. Tomkins, Jr. to Judge Buchwald, July 6, 1991, at 2.

The statement by Ford that "[w]e have read the *Pahuta* case and agree with the Court that the Court should charge either negligence or strict products liability, but not both," failed to state distinctly either "the matter objected to" or "the grounds of the objection." Fed.R.Civ.P. 51. The specific objection that Ford asks this Court to read into its pre-trial correspondence is that the jury's finding that the cruise control system of the 1991 Ford Aerostar was not designed in a defective manner presumes that Ford was not negligent in the design of the cruise control system. Ford's statement that either negligence or strict liability, but not both, should be charged, does not distinctly state this objection. Ford's current contention is not that it was error to charge two theories of liability but rather that, after determining that Ford was not strictly liable, the jury should not have considered whether Ford was negligent.[14] Ford's conduct at the pre-trial conference, if anything, obscured any objection it might have made in its correspondence with the court. At the conference, the speaker identified by Jarvis as "counsel for Ford" explained that "it seems that the claim of the plaintiff here is one of negligence and certain product liability." After the court later asked, "[s]o you don't want me to

---

14. We further note that Ford, in making its objection before the jury was dismissed, assigned error only to the jury's finding negligence without strict liability, not to the possible finding of strict products liability without negligence. Ford argued to the district court that "by finding 'no' on Question 1A that the cruise control was not designed in a defective manner, the jury cannot then find that Ford was negligent in the design of the cruise control system. The opposite would be so, but it can't be so in that direction." Ford's pre-trial preference for charging one, but not both, causes of action fails to capture this distinction, providing further evidence that Ford's statement failed to state distinctly the grounds of its objection.

charge negligence?" the speaker, identified again by Jarvis as a counsel for Ford, responded, "Well, we're going to reserve on that. We want you to leave negligence in for now." Pre-trial tr. at 36. Accordingly, Ford did not distinctly state "the matter objected to." In fact, it appears to have asked the court to leave both causes of action in the jury charge.

Neither did Ford state distinctly "the grounds of its objection." In the pre-trial correspondence and conference, Ford made no legal argument for charging only one cause of action outside of the passing reference to our footnote in the *Pahuta* case. In that footnote, we mentioned merely that the plaintiff had voluntarily withdrawn a negligence charge. *Pahuta*, 170 F.3d at 134 n. 7. Ford cited no authority to show why the district court should find the negligence cause of action duplicative of the strict liability claim in this case. In recalling how it came to charge the jury under both theories, the district court remarked simply that the plaintiff had asked for the charge and that in one case, presumably *Pahuta*, "the plainiff[ ] had agreed to drop one of the claims." After the verdict, in ruling on Ford's motions, the district court rebuked counsel for not calling its attention earlier to the relevant legal authority in New York regarding the similarities between negligence and strict liability for product defects, indicating its suspicion that it appeared that this failure was "a tactical decision" made "for strategic reasons to refrain from informing us of the overlap and potential for inconsistent verdicts." *Jarvis*, 69 F.Supp.2d at 587 n. 8. In this regard, it appears that the district court agreed that Ford did not distinctly state "the grounds of its objection." Fed.R.Civ.P. 51.

 On appeal, Ford claims that there was no need to object once the district court had announced at the pre-trial conference that it would charge both theories of liability because any further objection would have been futile. The credibility of Ford's assertion is undermined by Ford's later objection, demonstrating that Ford did not feel constrained at all. Far from futile, this later objection, now accompanied by a reasoned legal argument as to the potential overlap of the two causes of action, persuaded the district court that it should not have charged the jury on both theories. Ford cannot show the futility of future objection because it has not shown that "the trial court had been clearly apprised of the possibility of error and had disagreed, or had been given an opportunity to correct the error and had declined to do so." *Fogarty*, 162 F.3d at 80 (finding waiver after "court explicitly asked for both an objection and alternative language, and received, respectively, a vague answer and silence in response"). Having failed to provide the district court with an adequate opportunity to consider and deny the objection, a party cannot later argue that any further objection would have been futile. The case Ford cites to support its proposition that objection is not waived if the district court had previously rejected its position, *Anderson v. Branen*, 17 F.3d 552 (2d Cir.1994), presented a very different factual situation. There, the plaintiffs requested a duty to intercede charge, which was subsequently "expressly raised and discussed at length" at the charge conference. *Id.* at 557. The court agreed to give the charge, but then retracted it and stated to counsel "that if this is something that we raised the other day, you don't need to repeat yourself." *Id.* Under these circumstances, we found that further objection to the charge was unnecessary. *Id.* Because Ford failed to raise expressly its current objection, and thus the district court was never given the opportunity to consider its argument, Ford

cannot claim that future objection would have been unavailing.

In making this argument, Ford relies on the finding of the district court that "[a]lthough it is true •that defense counsel did not specifically object to our charge and special verdict questions on the ground that they could lead to inconsistent results," Ford's "fundamental position . . . had previously been expressed to the Court" and therefore "it was reasonable for defendant to conclude that future efforts to object would be unavailing." *Jarvis*, 69 F.Supp.2d at 589. As discussed above, Fed.R.Civ.P. 51 requires more than the disclosure of a "fundamental position" desiring one jury charge over another. The federal rules instead require that Ford "stat[e] distinctly the matter objected to and the grounds of the objection." Fed.R.Civ.P. 51. Finding that the district court failed to apply this standard, we do not owe deference to the district court's conclusion. *See Pullman–Standard*, 456 U.S. at 287, 102 S.Ct. 1781 ("[I]f a district court's findings rest on an erroneous review of the law, they may be set aside on that basis.").

For the reasons stated, under the principles of Rule 51 Ford has waived its objection to verdict inconsistency. As discussed above, we decline the dissent's invitation to ignore our jurisprudence in this area and shoehorn this case into Rule 49 in order to avoid this result. The policy concerns behind the dissent's dissatisfaction with what it perceives as inconsistent verdicts are no more compelling than those behind the principle of waiver. In this ten-year litigation, the issue of the jury charge was litigated extensively. Ford asked for this jury charge, presumably for strategic reasons, and was well apprised of the law of waiver. To excuse Ford from the well-established rules of waiver would permit precisely the sort of "sandbagging" that the rules are designed to prevent, while undermining the ideal of judicial economy that the rules are meant to serve.

4. Fundamental Error

Although Ford has not requested that we do so, this Court may review jury instructions and verdict sheets for "fundamental" error even when a litigant has not complied with the Fed. R.Civ.P. 51 objection requirements. *See Shade v. Housing Auth. of New Haven*, 251 F.3d 307, 312 (2d Cir.2001). Fundamental error is more egregious than the "plain" error that can excuse a procedural default in a criminal trial, *see id.*, and is "so serious and flagrant that it goes to the very integrity of the trial." *Id.* at 313 (quoting *Modave v. Long Island Jewish Medical Ctr.*, 501 F.2d 1065, 1072 (2d Cir. 1974)). We have found relief from fundamental error to be warranted when the jury charge "deprived the jury of adequate legal guidance to reach a rational decision." *Werbungs v. Collectors' Guild, Ltd.*, 930 F.2d 1021, 1026 (2d Cir.1991). Because the degree of overlap between negligence and strict liability for design defects is unsettled under New York law, the integrity of the trial was not endangered by the jury instructions and verdict sheet in this case.

Ford, on appeal, contends that "[u]nder New York law, negligence and strict products liability claims for design defects are functionally the same and virtually indistinguishable."[15] Neither this Court nor the New York Court of Appeals has

---

**15.** As noted above, Ford's objection after the jury returned its verdict claimed only that there was no strict liability without negligence, but not the converse. For these purposes, however, we need not distinguish between the more narrowly framed objection after the jury verdict and the more sweeping statement made on appeal.

squarely endorsed such a rule. Traditionally, the New York Court of Appeals has held that negligence and strict liability provide distinct forms of relief in products liability. *See Victorson v. Bock Laundry Machine Co.*, 37 N.Y.2d 395, 373 N.Y.S.2d 39, 335 N.E.2d 275, 277 (1975) ("Depending on the factual context in which the claim arises, the injured plaintiff, and those asserting derivative claims, may state a cause of action in contract, express or implied, on the ground of negligence, or, as here, on the theory of strict products liability.").

To be sure, more recently the New York Court of Appeals, in discussing the historical development of the law of products liability, quoted approvingly from a law review article in stating that " '[i]n general, ... the strict liability concept of "defective design" [is] functionally synonymous with the earlier negligence concept of unreasonable designing.' " *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 639 N.Y.S.2d 250, 662 N.E.2d 730, 735 (1995) (quoting Gary T. Schwartz, *New Products, Old Products, Evolving Law, Retroactive Law*, 58 N.Y.U. L.Rev. 796, 803 (1983)). This statement was, however, dicta. The *Denny* court decided only that strict liability and breach of implied warranty claims are not identical under New York law, that the latter is not necessarily subsumed by the former, and that a jury's finding of no product defect was reconcilable with its finding of breach of warranty. *Denny*, 639 N.Y.S.2d 250, 662 N.E.2d at 739.[16]

The statement that "in general" the relevant concepts are "functionally synonymous" is further tempered by the court's more reserved conclusion later in the opinion that "[t]he adoption of [a] risk/utility balance as a component of the 'defectiveness' element has brought the inquiry in design defects cases closer to that used in traditional negligence cases, where the reasonableness of an actor's conduct is considered in light of a number of situational and policy-driven factors." *Id.* at 738. In addition, in responding to the dissent's urging that the strict liability and breach of warranty causes of action can be merged, the *Denny* court pointed to the commentator upon whom the dissent relied as "affirmatively criticiz[ing] courts that have failed to separate conceptually the notions of strict liability, negligence, warranty, and absolute liability." *Id.* at 738 (internal quotation marks omitted). We state no opinion as to how we might rule if required to decide whether, under New York law, the negligence cause of action in this case was duplicative of the strict liability cause of action and whether the dicta in *Denny* accurately reflects how the New York Court of Appeals would rule on the matter. Given the unsettled nature of the law in this area, however, we hold that there was no "fundamental" error in the jury instructions or the verdict sheet.

## C. Collateral Source Hearing

■■ Jarvis claims that the district court abused its discretion in granting Ford's motion to reduce the amount of the jury verdict pursuant to N.Y.C.P.L.R. 4545(c) without holding a hearing. We disagree.

---

**16.** The *Denny* opinion itself suggests that dicta in this area may not always be reliable. In *Denny*, the New York Court of Appeals determined that, despite its earlier dicta that " 'strict liability in tort and implied warranty in the absence of privity are merely different ways of describing the very same cause of action,' " *id.* at 741 (quoting *Mendel v. Pittsburgh Plate Glass Co.*, 25 N.Y.2d 340, 305 N.Y.S.2d 490, 253 N.E.2d 207, 210 (1969)), "[n]onetheless, it would not be correct to infer that the tort cause of action has completely subsumed the older breach of implied warranty cause of action or that the two doctrines are now identical in every respect." *Denny*, 639 N.Y.S.2d 250, 662 N.E.2d at 734.

After the jury returned its verdict, Ford moved pursuant to N.Y.C.P.L.R. 4545(c) to reduce the verdict on the basis of collateral disability payments Jarvis had already received and would continue to receive in the future.[17] Jarvis, in response to this request, simply stated that "there is no evidence which would warrant any reduction in the verdict pursuant to C.P.L.R. § 4545(c)."

At trial, however, Dr. Marcus, Jarvis's expert, testified that the combined value of past and future collateral payments would equal $473,469. Jarvis did not object to Dr. Marcus's testifying as to the amount of past and future collateral source payments. In her deposition testimony, Jarvis had confirmed that she was receiving monthly payments from a private disability policy, and, in answer to Ford's interrogatories, she admitted she was receiving long term disability benefits in addition to her Social Security disability payments. Dr. Donald S. Chambers, her treating psychiatrist, testified in detail concerning the significant impairments that Jarvis suffered as a result of the accident and described his expectation for her improvement as "quite low."

In view of the facts in the record, we reject Jarvis's contention that there is "no evidence" to support a reduction in the verdict pursuant to N.Y.C.P.L.R. 4545(c). Concerning the need for further proceedings, we note that on appeal Jarvis has not challenged any particular calculation made by Dr. Marcus nor has she claimed that she has not in the past, or will not continue in the future, to receive the benefits that Dr. Marcus described. Because on appeal Jarvis has not raised a disputed issue of material fact in opposing the reduction of the verdict by collateral source payments, we find that the district court did not abuse its discretion in not holding further proceedings.

D. Other Issues

■ Jarvis also contends that the district court erred in dismissing her claim for punitive damages. At oral argument, counsel for Jarvis stated that it would waive further proceedings on punitive damages if we were to reinstate the jury verdict and provide for a fair determination of any collateral source payments. Having reinstated the jury verdict and determined that Jarvis failed to raise a disputed issue of material fact warranting further proceedings on collateral source payments, we deem that Jarvis has waived any challenge to the dismissal of her claim for punitive damages. Given this resolution of the dispositive issues on appeal, no need exists to reach other issues raised by Jarvis.[18]

## CONCLUSION

We reinstate both the jury's verdict that Ford was negligent in the design of the

---

**17.** N.Y.C.P.L.R. 4545(c) provides, in pertinent part, that "where the plaintiff seeks to recover for the cost of medical care, dental care, custodial care or rehabilitation services, loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source.... If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any collateral source, it shall reduce the amount of the award by such finding."

Ford, in its motion, stated that the "date, time and place of hearing" on the motion should be "determined by the Court."

**18.** These include the district court's (1) dismissal of Jarvis's negligent failure to warn claim; (2) evidentiary rulings; and (3) denial of a request for a hearing pursuant to Fed. R.Civ.P. 60(b).

cruise control mechanism in the 1991 Aerostar and the jury's award of damages. We hold that Ford waived any objection to an inconsistent verdict by failing to object with the requisite specificity to the jury charge or verdict sheet before the jury retired to deliberate. Finally, we affirm the district court's reduction of the jury award pursuant to N.Y.C.P.L.R. 4545(c). Accordingly, we vacate the judgment of the district court and remand with instructions to enter judgment in Jarvis's favor consistent with this opinion.

VAN GRAAFEILAND, Senior Circuit Judge, concurring in part and dissenting in part.

I concur in the majority's view that the trial court erred in granting Ford's motion for J.M.O.L. I am convinced, however, that the verdict form was submitted under Fed. R.Civ.P. 49 and Ford's objection thereto, made before the jury was discharged, was timely. Moreover, because entering judgment on a verdict that is irreconcilably inconsistent creates an uncertainty as to the meaning of the verdict that is fundamentally unacceptable, I dissent from the portion of the opinion that finds that Ford waived any objection to the inconsistency. The proper remedy, in my view, would be a remand for a new trial.

The majority finds that the inconsistency complained of here is "between two general verdicts" and thus, the provisions of Rule 49 do not apply. This reasoning is beyond my ken. A general verdict, by definition, asks "only whether the defendant was liable to the plaintiff, and if so, what damages are awarded." *Lavoie v. Pac. Press & Shear Co.*, 975 F.2d 48, 53 (2d Cir.1992). In other words, a general verdict asks merely the question of ultimate liability. *See id.* at 54 (verdict form "did not offer the jurors only the ultimate choice normally called for by a general

verdict—the defendant is liable to the plaintiff for a specified amount of damages, or the defendant is not liable to the plaintiff"); *see also Black's Law Dictionary* 1555 (7th ed.1999) (defining "general verdict" as "verdict by which the jury finds in favor of one party or the other, as opposed to resolving specific fact questions").

In contrast, a special verdict "is a term of art, and properly speaking refers only to special findings regarding factual issues that the court may ask the jury to resolve, or perhaps mixed questions of law and fact, assuming applicable legal standards are charged." *Mfrs. Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 26 (2d Cir.1986), *cert. denied* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

The majority's assertion that the inconsistency in this case was "between two general verdicts" cannot be as that phrase is correctly defined, *supra*. It is truly axiomatic that **one** cause of action can produce but **one** general verdict. Here, Jarvis, though proceeding on different theories of liability, had but one cause of action against Ford, viz. a cause of action for injuries sustained when her vehicle crashed. Courts everywhere (including New York) recognize this fundamental principle: "[S]ince a plaintiff can have but one recovery for one wrong, he has but a single cause of action and each of the available supporting theories is merely a different count in support of the single claim." *European Am. Bank v. Cain*, 79 A.D.2d 158, 162, 436 N.Y.S.2d 318, 320–21 (1981). *See also Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 311, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945) ("It is not uncommon that a single cause of action in tort will rest both on omission of a statutory duty and on common-law negligence; the two bases do not necessarily multiply the causes of action."); *Baltimore S.S. Co. v. Phillips*, 274 U.S. 316, 321, 47 S.Ct. 600, 71

L.Ed. 1069 (1927) ("A cause of action does not consist of facts, but of the unlawful violation of a right which the facts show. The number and variety of the facts alleged do not establish more than one cause of action so long as their result, whether they be considered severally or in combination, is the violation of but one right by a single legal wrong.... The facts are merely the means, and not the end.") (internal quotation marks omitted); *Werlein v. City of New Orleans,* 177 U.S. 390, 400, 20 S.Ct. 682, 44 L.Ed. 817 (1900) (different grounds complaining of same basic wrong and fact pattern form one single cause of action); *Saud v. Bank of N.Y.,* 929 F.2d 916, 919 (2d Cir.1991) ("it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies") (quoting *Expert Elec., Inc. v. Levine,* 554 F.2d 1227, 1234 (2d Cir.) *cert. denied* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977)); *Norman v. Niagara Mohawk Power Corp.,* 873 F.2d 634, 638 (2d Cir.1989) ("new legal theories do not amount to a new cause of action"); *In re Teltronics Servs., Inc.,* 762 F.2d 185, 193 (2d Cir.1985) (same); *Smith v. Russell Sage Coll.,* 54 N.Y.2d 185, 192, 429 N.E.2d 746, 749, 445 N.Y.S.2d 68, 71 (1981) (single "cause of action may denote one of several separately stated claims in a pleading based on the same congeries of facts but related to different legal theories of recovery") (quoting *Reilly v. Reid,* 45 N.Y.2d 24, 29, 407 N.Y.S.2d 645, 379 N.E.2d 172 (1978)); *Payne v. N.Y., Susquehanna & W. R.R. Co.,* 201 N.Y. 436, 441–42, 95 N.E. 19 (1911) (stating in action where plaintiff pleaded three separate legal theories of liability for same injury: "Obviously there is but one primary right, one primary wrong, and one liability. The single wrong has given rise to a single right, which may be established by as many different facts as the nature of the case may justify or demand."); *Bradley v. Condon,* 217 N.Y.S.2d 821, 823 (N.Y.Sup.Ct.1961) ("Though [a] claim is based on two separate legal theories ... it constitutes but one cause of action.... Different legal theories or grounds of liability do not necessarily create different causes of action...."); *Kings County Pharm. Soc'y v. City of New York,* 198 N.Y.S.2d 339, 339 (N.Y.Sup.Ct.1960) ("If the facts alleged ... show one primary right of the plaintiff and one wrong done by the defendant which involves that right, the plaintiff has stated but a single cause of action."); *Weinstein v. Schwartz,* 107 N.Y.S.2d 337, 341 (N.Y.Sup.Ct.1951) ("Different legal theories or different grounds of liability do not make different causes of action."); *Frontheim v. Fred F. French Inv. Co.,* 102 N.Y.S.2d 589, 591 (N.Y.Sup.Ct.1951) (same).

Since it is unmistakable that because Jarvis suffered only one set of injuries from one set of facts, she had but one cause of action. That she proceeded on the theories of both strict liability and negligence does not change this. Logically, there could not possibly have been two separate questions of ultimate liability (the question a general verdict asks) on one single cause of action. There simply could not have been two general verdicts (consistent or otherwise) in this case, which had only one cause of action.[1]

The only possible interpretation is that the verdict form submitted to the jury was either a general verdict with special interrogatories under Rule 49(b) or a special verdict under Rule 49(a). An easy way of

---

1. To the extent that *Lavoie* might be read for the proposition that one cause of action on two different theories of liability may support two general verdicts, such language is inconsistent with the law. Thus, as my colleagues rely on this language, they are equally wrong.

looking at it is that a general verdict asks merely "who wins?" A special verdict or general verdict with interrogatories asks "why?"

Here, the jury was given a form, labeled by the district court as a "special verdict," that asked not whether the defendant was liable and in what amount, but rather a series of fact questions. Such questions are the hallmarks of a special verdict and are governed by Rule 49(a). Under this view, they were questions that "enabled a legal conclusion as to liability, but the jury was not asked for such a conclusion." *Caruso v. Forslund*, 47 F.3d 27, 33 (2d Cir. 1995) (Kearse, J., concurring) (distinguishing between general and special verdicts).

An alternative view of the verdict form is that it was submitted as one general verdict accompanied by written answers to interrogatories, as contemplated by Rule 49(b) (i.e., questions 5, 6, and 7 "awarding" damages to the plaintiff properly can be viewed as embodying a general verdict since they ask the question of ultimate liability; questions 1, 2, 3, and 4 are questions of fact upon which the general verdict depends). *See Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1151 (6th Cir. 1996) (analyzing similar verdict form as here under Rule 49(b)); *Stanton by Brooks v. Astra Pharm. Prods., Inc.*, 718 F.2d 553, 574 (3d Cir.1983) (same). As we have previously noted, the distinction between a Rule 49(a) verdict and one submitted under 49(b) is vague. *See Denny v. Ford Motor Co.*, 42 F.3d 106, 111 (2d Cir.1994) ("[T]here is no clear definition in our caselaw of what constitutes a Rule

49(a) verdict and what constitutes a Rule 49(b) verdict.").

But under which paragraph of Rule 49 the verdict form in this case was submitted need not be decided, because under either view, Ford's objection to the inconsistency was timely and the remedies under both views are fundamentally the same. We have previously stated that under Rule 49(a) *and* (b), a case-by-case application of principles of waiver is desirable and that parties complaining of inconsistencies in 49(a) verdicts might waive their objection by failing to raise the objection before the jury is discharged.[2] *Denny*, 42 F.3d at 111 (waiver might be found in a case where, e.g., court announces intention to enter judgment on inconsistent verdict before jury is discharged and litigants remain silent). Our cases involving waiver and inconsistent verdicts, however, have involved situations in which the party seeking a new trial failed to object before the jury was discharged. *See id.* at 110–111; *Lavoie*, 975 F.2d at 54–57; *Schaafsma v. Morin Vt. Corp.*, 802 F.2d 629, 634–35 (2d Cir.1986); *Haskell v. Kaman Corp.*, 743 F.2d 113, 123 (2d Cir.1984). It emerges from these cases that the crucial time period for the party to object is before the jury is discharged. This is because resubmission to the jury might cure the inconsistency, and courts want to discourage a litigant's tactical misuse of Rule 49 to secure a new trial. *See Skillin v. Kimball*, 643 F.2d 19, 19–20 (1st Cir.1981) (explaining rationale for requirement of pre-discharge objections). Here, however, Ford made an objection to the inconsistency as soon as the jury announced its decision

---

**2.** Many of our sister circuits have found that under Rule 49(a), a party need not object at all in order to preserve the issue for a subsequent motion to the district court or on appeal. *See Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 851 (10th Cir.2000); *Pierce v. S. Pac. Transp. Co.*, 823 F.2d 1366, 1370 (9th Cir.1987); *Ladnier v. Murray*, 769 F.2d 195, 198 (4th Cir.1985); *Malley–Duff & Assoc. v. Crown Life Ins. Co.*, 734 F.2d 133, 144–45 (3d Cir.1984) *cert. denied* 469 U.S. 1072, 105 S.Ct. 564, 83 L.Ed.2d 505 (1984); *Mercer v. Long Mfg. N.C., Inc.*, 671 F.2d 946, 947–48 (5th Cir.1982).

and before the jury was discharged. In no circumstance have we ever found that an objection made at this point in the proceedings resulted in waiver.

Moreover, we consistently have held that if the jury's inconsistent findings on a special verdict cannot be harmonized, the Seventh Amendment requires that either the trial court or the reviewing court vacate the judgment and order a new trial. *See Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 598 (2d Cir.2001); *Brooks v. Brattleboro Mem'l Hosp.*, 958 F.2d 525, 529 (2d Cir.1992); *Auwood*, 850 F.2d at 891..

If, on the other hand, the verdict is viewed as having been submitted under Rule 49(b), then because the two special interrogatory questions (1a and 2a) were inconsistent with each other, and question 1a was inconsistent with the general verdict (questions 5–7), judgment cannot be entered for either Jarvis or Ford. *See* Fed. R.Civ.P. 49(b) ("When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, judgment shall not be entered, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial."). Although we have found that waiver is possible under Rule 49(b) if a party fails to object prior to the discharge of the jury (despite the unequivocal language of the rule that "judgment shall not be entered"), *see Haskell*, 743 F.2d at 123, more recently we have confirmed that Rule 49(b) requires the trial court to "resolve the inconsistency even when no objection is made." *Schaafsma*, 802 F.2d at 634–35 (internal quotation marks omitted). Again, because Ford made an objection before the jury was discharged, even if waiver might be properly found under Rule 49(b), it cannot be found in this case.

Thus, viewing the verdict as being submitted under either 49(a) or 49(b), it is this Court's responsibility to harmonize the inconsistency, or if we are unable to do so, to vacate the judgment of the district court and order a new trial. The one view that is not appropriate, and the one the majority takes, is that the inconsistency here is between two general verdicts on different theories. Despite the majority's assertion to the contrary, the inconsistency complained of **is** between two factual findings, namely that the Aerostar's cruise control was both not defective and defective. While it is true that the New York Court of Appeals has not yet squarely addressed the question as to the overlap between strict products liability and negligent design, it has in *dicta*, as the majority notes, signaled directly to this Court how it would find if asked. *See Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258, 639 N.Y.S.2d 250, 255, 662 N.E.2d 730, 735 (1995) (approving of view that defective design is functionally synonymous with earlier negligence concept of unreasonable designing). *See also Gonzalez v. Morflo Indus., Inc.*, 931 F.Supp. 159, 163 n. 3 (E.D.N.Y.1996) (citing *Denny* for proposition that "negligence and strict liability design defect claims are virtually indistinguishable").

Even in the absence of an explicit statement from the New York Court of Appeals, we can decide that a finding of "no" to strict liability and a finding of "yes" to negligence are inconsistent. Under New York law, "[a] cause of action in strict products liability lies where a manufacturer places on the market a product which has a **defect** that causes injury." *Robinson v. Reed–Prentice Div. of Package Mach. Co.*, 49 N.Y.2d 471, 478, 426 N.Y.S.2d 717, 403 N.E.2d 440, 443 (1980) (emphasis added). Similarly, under New York's theory of negligent design, "[a] cause of action in negligence will lie where

it can be shown that a manufacturer was responsible for a **defect** that caused injury, and that the manufacturer could have foreseen the injury." *Id.* at 480, 426 N.Y.S.2d 717, 403 N.E.2d 440 (emphasis added). New York has stated that a verdict is inconsistent if "a verdict on one claim necessarily negates an element of another cause of action." *Barry v. Manglass,* 55 N.Y.2d 803, 805, 447 N.Y.S.2d 423, 432 N.E.2d 125, 126 (1981).[3] Here, the finding of "no defect" in the strict liability claim precludes the finding of "defective" in the negligence claim. Thus, under New York law, and even in the absence of a clearly applicable statement from the New York Court of Appeals, the answer in one jury question negates an element of the other, and the verdict is inconsistent.

This exact conclusion has been reached by at least one New York Appellate court. *See Lundgren v. McColgin,* 96 A.D.2d 706, 464 N.Y.S.2d 317, 317–18 (1983) (reversing and granting a new trial because jury's responses to interrogatories on negligence (yes) and strict liability (no) were inconsistent: "There is no way to reconcile these two answers. The jury could not have concluded that Piper negligently designed the override system and at the same time conclude that it was reasonably safe for its intended use."). Just as the Appellate Division found in *Lundgren,* there is no way the two answers in this case can be reconciled; the jury could not have simultaneously found a defect and no defect in the design the cruise control system.

Having found no way to reconcile the jury answers to questions submitted to them pursuant to Rule 49, the law demands that we vacate the judgment and remand for a new trial.[4] We have explicitly stated, "the proper approach when faced with seemingly inconsistent verdicts is not to credit one finding and vacate the other." *Harris,* 252 F.3d at 598. The majority in this case does exactly that by crediting the finding that Ford was negligent, while discarding the finding that it was not strictly liable.

Rejection of this correct legal standard by the majority hinges on the erroneous view that Rule 49 does not govern where the jury has been asked to "apply legal principles." That is not the law of this Circuit. *See Landy v. Fed. Aviation Admin.,* 635 F.2d 143, 147 (2d Cir.1980) ("There is no need to belabor the obvious. The factual findings necessary to support the severe penalty imposed below could not be made without reference to the applicable Aviation Regulations.... [Rule 49(a)], which deals with special verdicts and interrogatories, provides that the court shall give the jury such explanation and instruction as is necessary to enable the jury to make its findings. If, as in this case, an interrogatory is a mixed question of fact and law, the jury must be instructed as to the legal standards they are to apply.").

Nor is it the law of, at least, the First, Fourth, Fifth, Sixth, Eighth, or Federal

---

3. In *Barry,* the court found that the apparent jury inconsistency could be resolved because the jury was permitted (while expressing no view as to the propriety of the charge) to find that the product was being misused as a defense to strict liability, but not to negligence. *Barry,* 55 N.Y.2d at 804–05, 447 N.Y.S.2d 423, 432 N.E.2d at 126–27. In the case at bar there is no defense that would apply to one theory but not another, nor is there an allegation of failure to warn. *Cf. Grant v. Westinghouse Elec. Corp.,* 877 F.Supp. 806

(E.D.N.Y.1995) (verdict of no strict liability consistent with finding of negligence where negligence was based on failure to warn).

4. A new trial might also provide the parties with a jury that is proficient in performing simple addition free from mathematical error, a task that, from the entries made on the verdict form, apparently was beyond the capabilities of the jury in this case.

Circuits. *See Kissell v. Westinghouse Elec. Corp.,* 367 F.2d 375, 376 (1st Cir. 1966) ("It would be a purposeless restriction to say that special interrogatories cannot be mixed questions of law and fact, provided that the jury is properly instructed as to the law."); *Scott v. Isbrandtsen Co.,* 327 F.2d 113, 119 (4th Cir.1964) ("Generally, Rule 49(a) permits submission of special interrogatories to juries on issues of fact, but if an issue presents a mixed question of fact and law it may be submitted if the jury is instructed as to the legal standards to be applied; the form of the special issues should be such as not to mislead or confuse the jury."); *Jackson v. King,* 223 F.2d 714, 718 (5th Cir.1955) (Rule 49(a) "permits submission of special interrogatories to juries only of issues of fact. If the question is a mixed question of fact and law, it may be submitted only if the jury is instructed as to the legal standards which they are to apply."); *Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 715 (6th Cir.) (no error where questions submitted under Rule 49(b) required jury to apply law to facts as long as jury was instructed on that law), *cert. denied* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975); *Great Am. Ins. Co. v. Horab,* 309 F.2d 262, 266 (8th Cir.1962) ("This court has recognized, too, that, under Rule 49(a), a mixed question of fact and law is nevertheless submissible so long as it is not 'submitted to the jury without an accompanying instruction explaining the legal standards which they are to apply.'" (quoting *McDonnell v. Timmerman,* 269 F.2d 54, 58 (8th Cir.1959)) (citing *Feldmann v. Conn. Mut. Life Ins. Co.,* 142 F.2d 628, 634 (8th Cir.1944))); *Quaker City Gear Works, Inc. v. Skil Corp.,* 747 F.2d 1446, 1453 (Fed.Cir.1984) ("Finally, while 'a specific verdict' seeks resolution of only factual issues under a precise reading of Rule 49(a), this court has not found error where a legal question has been included. Rath-

er, since the answer to the legal question necessarily resolves any disputed underlying factual issues, we have undertaken to review the factual findings on which the legal conclusion is based, applying the substantial evidence standard." (citing *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1550 (Fed.Cir.1983)), *cert denied* 471 U.S. 1136, 105 S.Ct. 2676, 86 L.Ed.2d 694 (1985)).

The learned author of the majority opinion describes our efforts as an attempt to "shoehorn" the case into Rule 49 in order to avoid the effect of waiver. She continues in this same vein, claiming that to "excuse" Ford from the "well-established" rules of waiver permits "sandbagging" and an undermining of judicial economy.

Instead of sermonizing in the field of legal ethics, the majority should have at least mentioned Fed.R.Civ.P. 46 ("[f]ormal exceptions to rulings or orders of the court are unnecessary"), which is clearly pertinent in this case. Rule 51, which deals with jury instructions, must be read together with Rule 46. *See Girden v. Sandals Int'l,* 262 F.3d 195, 202 (2d Cir.2001) (Rule 51 must be read in conjunction with Rule 46); *Thornley v. Penton Publ'g., Inc.,* 104 F.3d 26, 30 (2d Cir.1997) (rejecting Rule 51 forfeiture because, after party "argued its position to the district judge, who rejected it, a further exception after delivery of the charge would have been a mere formality, with no reasonable likelihood of convincing the court to change its mind on the issue"); *In re Air Crash Disaster at J.F.K. Int'l Airport,* 635 F.2d 67, 73 (2d Cir.1980) ("Federal Rule of Civil Procedure 51 read in conjunction with Rule 46 requires only a minimal objection...."); *Steinhauser v. Hertz Corp.,* 421 F.2d 1169, 1173 (2d Cir.1970); *Curko v. William Spencer & Son, Corp.,* 294 F.2d 410, 414 n. 2 (2d Cir.1961) ("Rule 51 must be read in conjunction with Rule 46...."); *Keen v.*

*Overseas Tankship Corp.*, 194 F.2d 515, 519 (2d Cir.1952) (rejecting Rule 51 waiver because "[n]othing goes further to disturb the proper atmosphere of a trial than reiterated insistence upon a position which the judge has once considered and decided"); *Wright v. Farm Journal, Inc.*, 158 F.2d 976, 978 (2d Cir.1947) (stating Rule 51 "must be construed in the light of Rule 46"); *Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 276 (3d Cir.1998) (noting relationship between Rule 51 and Rule 46 and stating "our belief that Rule 51 must be read in conjunction with Rule 46"); *City of Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 453 (4th Cir. 1990) ("Rule 51 must be read in conjunction with Rule 46"); *Landsman Packing Co., Inc. v. Cont'l Can Co., Inc.*, 864 F.2d 721, 726 (11th Cir.1989) (same); *Brown v. AVEMCO Inv. Corp.*, 603 F.2d 1367, 1370 (9th Cir.1979) ("Rule 51 is to be read together with Rule 46"); *Stewart v. Ford Motor Co.*, 553 F.2d 130, 140 (D.C.Cir. 1977) (same).

As in *Stewart v. Ford, supra,* the majority's argument:

> rests on a misconception of the meaning of [Rule 51]. As courts and commentators have recognized, Rule 51 is to be read together with Rule 46.... In order to preserve for appeal an objection to a jury instruction, thus, it is not necessary for a party to except or object "if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing."

553 F.2d at 140 (citations and footnotes omitted) (quoting 9 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2553 (1971)). Given this lenient standard, I cannot see how the majority finds that Ford failed to sufficiently object before the district court charged the jury. The district court stated that it understood that Ford did not want both theories charged and that this was Ford's "fundamental position." *Jarvis*, 69 F.Supp.2d at 589. Thus, the district court did indeed apply the "appropriate legal standard" under Rule 51 especially when read in conjunction with Rule 46. The majority's omission of Rule 46 considerations in their version of what they call "the appropriate standard" is what tips the balance in favor of Jarvis on the waiver issue.

I dissent.

## [Appendix: Verdict Form]

### SPECIAL VERDICT QUESTIONS

*Jarvis v. Ford Motor Company*
92 Civ. 2900 (NRB)

If the answer to any question that follows is, by a preponderance of the evidence, "Yes", then you should check the box marked "Yes"; otherwise, you should check the box marked "No". Your answer to each question must be unanimous.

1(a) Do you find by a preponderance of the evidence that the cruise control system of the 1991 Ford Aerostar was designed in a defective manner? (Plaintiff's Burden of Proof)

*Answer:* YES \_\_\_\_ NO ✓

IF YOUR ANSWER TO QUESTION 1(a) IS "YES", THEN PROCEED TO QUESTION 1(b). IF YOUR ANSWER TO QUESTION 1(a) IS "NO", THEN PROCEED TO QUESTION 2(a).

1(b) Do you find by a preponderance of the evidence that the design defect in the cruise control system of the 1991 Ford Aerostar was a substantial factor in causing the accident of July 14, 1991 involving Plaintiff Kathleen Madaline Jarvis? (Plaintiff's Burden of Proof)

*Answer:* YES \_\_\_\_ NO \_\_\_\_

2(a) Do you find by a preponderance of the evidence that the defendant Ford Motor Company was negligent in the design of the cruise control system in the 1991 Ford Aerostar? (Plaintiff's Burden of Proof)

*Answer:* YES ✓ NO ___

IF YOUR ANSWER TO QUESTION 2(a) IS "YES", THEN PROCEED TO QUESTION 2(b). IF YOUR ANSWER TO QUESTION 2(a) IS "NO", THEN PROCEED TO THE INSTRUCTIONS FOLLOWING QUESTION 2(b).

2(b) Do you find by a preponderance of the evidence that the negligent design of the cruise control system of the 1991 Ford Aerostar was a substantial factor in causing the accident of July 14, 1991 involving Plaintiff Kathleen Madaline Jarvis? (Plaintiff's Burden of Proof)

*Answer:* YES ✓ NO ___

IF YOUR ANSWERS TO BOTH QUESTIONS 1(a) AND 1(b) IS "YES", AND/OR YOUR ANSWERS TO BOTH QUESTIONS 2(a) AND 2(b) IS "YES", THEN PROCEED TO THE NEXT QUESTIONS. OTHERWISE, PROCEED NO FURTHER AND REPORT TO THE COURT.

3(a) Do you find by a preponderance of the evidence that plaintiff Kathleen Madaline Jarvis was negligent in the operation of her Ford Aerostar on July 14, 1991? (Defendant's Burden of Proof)

*Answer:* YES ✓ NO ___

IF YOUR ANSWER TO QUESTION 3(a) IS "YES", THEN PROCEED TO QUESTION 3(b). IF YOUR ANSWER TO QUESTION 3(a) IS "NO", THEN PROCEED TO QUESTION 5.

3(b) Do you find by a preponderance of the evidence that the negligence of plaintiff Kathleen Madaline Jarvis was a substantial factor in causing the July 14, 1991 accident? (Defendant's Burden of Proof)

*Answer:* YES ___ NO ___

IF YOUR ANSWER TO QUESTION 3(b) IS "YES", THEN PROCEED TO QUESTION 4. OTHERWISE, PROCEED TO QUESTION 5.

4. What is the percentage of fault, as found by you in response to Questions 1–3, which you attribute to the defendant Ford Motor Company and to the plaintiff Kathleen Madaline Jarvis?

| | | |
|---|---|---|
| Defendant Ford Motor Company | 65 | % |
| Plaintiff Kathleen Madaline Jarvis | 35 | % |

(THE TOTAL MUST EQUAL 100%)

5. State separately the amount awarded for the following items of damages, if any, up to the date of your verdict:

| | | |
|---|---|---|
| (a) Past medical insurance premiums; | $ | 24,568 |
| (b) Loss of earnings; | $ | 340,338 |
| (c) Pain and suffering up to the date of your verdict | $ | 200,000 |
| TOTAL: | $ | 564,906 |

NOTE: If you decide not to make an award as to any of the above items, you will insert the word "none" as to that item.

6. State separately the amount awarded for the following items of damages, if any, from the date of your verdict to be incurred in the *future*:

<div style="columns:2">

(a) Medical insurance premiums; $ 22,955

(b) Loss of earnings; $ 648,944

(c) Pain and suffering, including that from any permanent effect of the injury, from the time of verdict to the age that plaintiff could be expected to live. $ 300,000

Total $ 672,199

NOTE: If you decide not to make an award as to any of the above items, you will insert the word "none" as to that item.

7. If you have made any award for amounts intended to compensate the plaintiff for damages to be incurred in the future, then for each item for which an award is made, state the period of years over which such amounts are intended to provide compensation:

(a) Medical insurance premiums; 16 years

(b) Loss of earnings; 16 years

(c) Pain and suffering, including the permanent effect of the injury. 33.1 years

NOTE: If you make no award as to any of the above items, you will insert the word "none" as to that item.

You should now report to the Court.

Signature of Foreperson: /s/