**Walter CLARKE, Plaintiff,**

v.

**LR SYSTEMS and Lasits Rohline Service, Inc., Defendant.**

**Civil Action No. CV–99–5219 (DGT).**

United States District Court, E.D. New York.

Sept. 6, 2002.

Richard S. Vecchio, Worby Borowick Groner, White Plains, NY, for Plaintiff.

Elizabeth A. Weill, William J. Ricci, Lavin, Coleman, O'Neil, Ricci, Finarelli & Gray, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

Plaintiff Walter Clarke brings this products liability action against defendant LR Systems and Lasits Rohline Service, Inc. ("LR Systems")[1] for injuries he suffered in an industrial accident on August 13, 1996. Clarke originally brought suit in the Supreme Court of Kings County against LR Systems and Dayton Electric Manu-

facturing Company. The complaint charged these defendants with negligence and strict products liability, and breach of implied and express warranty. The case was removed to federal court based on diversity, and Clarke's employer, Favorite Plastics, Inc., was joined as a third-party defendant. Dayton and Favorite Plastics were subsequently voluntarily dismissed. LR Systems moved for summary judgment on December 19, 2001.

### Background

Clarke is a 74–year–old man who was born in Barbados, attended school through the seventh grade, and moved to the United States in 1972. Clarke Dep. at 8, 12. He began working at Favorite Plastics soon after arriving in the United States. *Id.* at 16–17. At first, Clarke worked as a "helper" to the operator of a plastic grinding machine, called a grinder or granulator. *Id.* at 19. About 20 years ago, Clarke became the operator of a granulator. *Id.* at 19, 23. For about a month, Clarke received training on the grinder from the operator he was replacing. *Id.* at 25.

At the time of the accident, Clarke worked on an "SG Granulator 300" produced by LR Systems in 1989 and subsequently sold to Favorite Plastics. Def. Affirmation ¶¶ 7, 8. This grinder was similar to the one Clarke had previously used, and was used by Clarke for several years prior to the accident. Clarke Dep. at 26.

The machine on which Clarke was injured takes plastic strips or pieces and grinds them into plastic granules. Def. Affirmation ¶ 12. The plastic is first placed into a hopper at the front end of the machine. The plastic is then fed by a powered roll feeder from the hopper into a

---

1. Lasits Rohline Service, Inc. does business as L–R Systems and is a single defendant. Ans. at 1.

cutting chamber, where a set of rotating knives move past a set of stationary knives. Report of Plaintiff's Expert Neal Growney ("Growney Report") ¶ 5.1.

Access to the cutting chamber is through a door on the front of the machine, below the hopper. To access the door, a bolt on the hopper must first be removed, and the hopper moved away on hinge. Clarke Dep. at 194. This access door has an electric interlock, meaning that opening it cuts off power to the motor. Growney Report ¶ 5.9. A screen behind the door, fastened by six bolts, must also be removed to get access to the cutting chamber. Clarke Dep. at 195. Access is necessary to clear jams and to periodically service or replace the knives. Growney Report ¶ 5.8. The access door had two warning stickers. One stated: "Sharp knife. Use extreme caution in knife area even though power to the machine is locked off." Clarke Dep. at 55. The second stated: "Warning: Disconnect the power servicing to prevent accidental start-up." Id.

The rotating knives are powered by a 15 horsepower motor located at the back of the machine. Growney Report ¶ 5.2. The power is transmitted to the rotating knives by a belt drive. Id. This drive consists of a grooved pulley [2] on the motor, a grooved pulley on the shaft of the rotating knives, and a set of five V-belts [3] that connect the two pulleys. Id.; Clarke Dep. at 131, 143.

The point at which the V-belt contacts the pulley forms an "in-running nip point." Growney Report ¶ 5.3. A nip point is where two surfaces come into contact, creating a point where an object can become caught or be pinched off. Id. A nip point is "in-running" when one or both of the surfaces are moving, and thus can draw an

object in contact with one of the surfaces into the nip point. Id.

The photographs show that the motor and belt drive are enclosed on the sides by a yellow metal housing, several feet long and several feet wide, and perhaps a foot taller at the end closer to the hopper and cutting chamber. The top of the yellow housing is covered by a removable rectangular blue metal cover that is fastened by four bolts and several latches, and appears to have two handles. Clarke Dep. at 155. The cover allows access to the motor and belt drive for service and periodic replacement of the belts. Id. at 38, 305. The belts occasionally became slack and needed to be replaced, and broke about every six months. Id. at 49, 272. When this occurred, the mechanic also needed to remove the yellow metal housing.

Unlike the cutting chamber access door, the blue metal cover was not interlocked. However, the grinder had a second interlock on the hopper. Growney Report ¶ 5.9. In addition, LR Systems designed the SG–300's controls with three interlock switches—a third interlock could be used on a sound deadening blower box. Id. ¶ 5.10. Favorite Plastics' grinder did not have a sound deadening box, and thus it was not equipped with the third interlock. Id. ¶ 5.11.

A warning sticker on the side of the yellow housing at the end near the hopper and cutting chamber stated: "Danger. Rotating parts—do not operate with guards removed." Def. Affirmation Ex. H. The blue cover had two warning stickers on the end near the hopper and cutting chamber. One stated: "Caution. Lock hopper in open position before knife change or cleanout to prevent accidental hopper closing." Def. Affirmation Ex. G.

---

**2.** A pulley, also called a sheave, is a wheel that turns, here by the motor.

**3.** V-belts are rubber belts that often have ridges to fit the grooves of a matching pulley.

The second stated: "Danger. Keep hands away—pinch point." *Id.*

During Clarke's time as a machine operator, the grinder often stopped operating due to jams in the cutting chamber. These jams could happen as often as two to three times a week, or as infrequently as once a month. Clarke Dep. at 77, 79, 313.

The operating manual designates a method for clearing jams through the interlocked door on the front of the machine. Def. Affirmation ¶¶ 11, 18 & Ex. E. The operator or mechanic should first electrically disconnect the grinder. Def. Affirmation Ex. E. Next, the hopper in the front of the machine is to be opened, and the feed chutes removed. *Id.* Excess material is then to be removed from the cutting chamber. *Id.* If material is jammed between the knives, the rotor can be turned manually by spanner wrenches after the guard is removed. *Id.* After the jam is cleared, the operator or mechanic is to close and lock the hopper before restarting the machine. *Id.*

Favorite Plastics employed several mechanics and electricians to service machines such as the grinder by changing its V-belts, sharpening or replacing its knives, and replacing burned-out fuses. Clarke testified during his deposition that a mechanic at Favorite Plastics showed him to clear a jam this way within a year or two of when he became the grinder operator, and that when the mechanics were busy, they told Clarke to clear the jam himself. Clarke Dep. at 30, 193–97, 260, 267.

Clarke also testified there was a second way to clear a jam. *Id.* at 32, 33. Clarke stated that rather than "take down the whole machine" by going through the access door, a jam could be cleared—presumably more quickly—by pushing and pulling the V-belts back and forth, which would loosen the jammed material in the cutting chamber. *Id.* at 32, 35, 85–88. In order to reach the V-belts, the blue cover over the motor and belt drive had to be removed. Clarke said he never removed the blue cover himself, but that a mechanic would do it. *Id.* at 292. Clarke stated that he taught himself to clear a jam this way, but that he also saw at least one mechanic use this method. *Id.* at 97–98. If the jam were heavy, Clarke would clear it through the front access door, but if it was slighter, he would push on the belts. *Id.* at 299.

According to Clarke, the mechanics occasionally removed the blue cover to change the V-belts and to clear jams by pushing and pulling on them. Approximately a year before the accident, a mechanic removed the blue cover from the grinder and did not re-attach it. *Id.* at 39, 89, 96. This was the first time the blue cover was left off for an extended period of time. *Id.* at 40, 43. The cover was left next to the grinder. *Id.* at 96. The yellow housing was on the grinder at the time of the accident. *Id.* at 111. With the cover off, it was easier for Clarke to clear jams, and he would first try to do so by pushing and pulling on the V-belts before clearing the jam via the cutting chamber access door. *Id.* at 97.

Clarke also testified that he was aware that it was dangerous to put his hand on a V-belt without first turning off the power. *Id.* at 225. Specifically, he stated: "If I don't turn off the power, it's dangerous to put your hand on the belt. You can't put your hand—The belt—the belt—The pulley and the belt is spinning very fast." *Id.* Clarke also twice answered affirmatively when asked during his deposition if he knew that he could hurt himself if he put his hand on the belts without first turning off the machine. *Id.* at 125–26, 225–26.

On August 13, 1996, the day of the accident, Clarke turned on the grinder at the beginning of his normal 6:00 a.m.–2 p.m.

shift. *Id.* at 104. At about 6:45 a.m., Clarke noticed that the grinder had stopped working. *Id.* at 101, 106–07. Clarke claims that he turned off the machine and went to try to clear the jam by pushing and pulling on the V-belts. *Id.* at 105, 107, 109, 113, 237, 287. Clarke testified that he went to the side of the grinder close to the V-belts, reached around the yellow housing, and put his palm on a V-belt with his fingers outstretched near the motor. *Id.* at 116–17, 137, 145. Clarke claims that he did not grasp the V-belt with his fingers. *Id.* at 116. He also testified that he could see the V-belts, but could not tell if they were moving. *Id.* at 114–15, 238–39, 280. Clarke stated that he tried to push the V-belt with his palm, but that his hand was quickly pulled into the blades of the grinder. *Id.* at 116–17, 119, 133, 141–42.

Some of Clarke's testimony is contradicted by his own expert, Growney. First, Growney concluded that the grinder was powered when the accident occurred, and that Clarke was "mistaken" when he said he turned it off. Growney Dep. at 102. Second, Growney testified that Clarke either grasped the V-belt or had his fingers draped around it without actually grasping it. *Id.* at 80. Third, Growney concluded that Clarke's hand was pulled into one of the in-running nip points, not the blades of the grinder.[4] Growney Report ¶ 3.0; Growney Dep. at 79.

In any case, Clarke was injured when his right hand was pulled into the machine. Clarke lost the top part of his thumb, and injured the top parts of his third, fourth, and fifth fingers. Clarke Dep. at 324. Clarke is right-handed, he still experiences numbness and in the fingers, and he has difficulty writing, eating, and grasping small objects. *Id.* at 332–34.

At the time of the accident, Clarke was paid $400 per week. *Id.* at 357. Following the accident, Clarke received workers' compensation benefits until his claim was settled for a lump sum. *Id.* at 355. The lump sum settlement was between $30,000 and $36,000, with $6,00 going to his attorney. *Id.* at 355–56. Clarke now receives Social Security retirement benefits and a pension from his union, but he never applied for Social Security disability benefits. *Id.* at 16, 359.

Clarke filed his complaint in the Supreme Court of Kings County on August 4, 1999 and it was removed to federal court on September 1, 1999. Def. Affirmation Ex. A.

During the course of this litigation, Clarke retained an expert, Growney, to testify on the adequacy of the warnings and the alleged design defect of the grinder. Growney produced a report that is examined in detail below.

### Discussion

"A manufacturer who places a defective product on the market that causes injury may be liable for the ensuing injuries. A product may be defective when it contains a manufacturing flaw, is defectively designed or is not accompanied by adequate warnings for the use of the product." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 237, 677 N.Y.S.2d 764, 766, 700 N.E.2d 303 (1998) (citation omitted).

Clarke alleges that LR Systems is liable for two reasons. First, he claims that the warning stickers on the grinder failed to adequately warn that users should not try to clear jams by grasping and pulling on

---

4. Based on Growney's observation that the V-belts moved counterclockwise from the side Clarke reached into the machine, meaning that the top of the V-belts were moving toward the motor and away from the grinder, it appears most likely that Clarke's hand was injured by the nip point of the V-belt and the pulley on the motor. Growney Dep. at 83.

the V-belts, and that the granulator should not be operated with the blue cover removed. Pl. Mem. at 9. Second, Clarke alleges that the absence of an electric interlock on the blue cover that would prevent the machine from operating with this cover removed constitutes a design defect.

### (1)

### Failure To Warn

A manufacturer has a duty to warn against: (1) latent dangers resulting from foreseeable uses of it product about which it knew or should have known; and (2) dangers of reasonably foreseeable unintended uses of a product. *See Liriano*, 92 N.Y.2d at 237, 677 N.Y.S.2d at 766, 700 N.E.2d 303. A defendant is liable if the plaintiff can establish that the duty to warn was breached and that the failure to warn was a substantial or proximate cause of the injury. *See Burke v. Spartanics, Ltd.*, 252 F.3d 131, 139 (2d Cir.2001) (quotation omitted); *Howard v. Poseidon Pools, Inc.*, 72 N.Y.2d 972, 974, 534 N.Y.S.2d 360, 361, 530 N.E.2d 1280 (1988); *Codling v. Paglia*, 32 N.Y.2d 330, 342, 345 N.Y.S.2d 461, 469–470, 298 N.E.2d 622 (1973); *Cramer v. Toledo Scale Co.*, 158 A.D.2d 966, 966, 551 N.Y.S.2d 718, 719 (4th Dep't 1990).

Plaintiff argues correctly that whether warnings were adequate to deter potential misuse and whether the failure to warn was a substantial cause of the injury is ordinarily a question for the jury. *See Howard*, 72 N.Y.2d at 974, 534 N.Y.S.2d at 361, 530 N.E.2d 1280; *Johnson v. Johnson Chem.*, 183 A.D.2d 64, 69, 588 N.Y.S.2d 607, 609 (2d Dep't 1992). However, a court may dismiss a failure to warn claim as a matter of law if: (1) the defendant had no duty to warn because the hazard was patently dangerous or posed an open and obvious risk, *see Burke*, 252 F.3d at 137; *Liriano*, 92 N.Y.2d at 241, 677 N.Y.S.2d at 769, 700 N.E.2d 303; or (2) the plaintiff cannot prove causation because

"the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of a safety device whose purpose is obvious." *Liriano*, 92 N.Y.2d at 241, 677 N.Y.S.2d at 769, 700 N.E.2d 303; *see also Burke*, 252 F.3d at 137 (no causation when plaintiff was actually aware of the danger of placing his hand in the cutting plane of a metal shearing machine); *Howard*, 72 N.Y.2d at 974–75, 534 N.Y.S.2d at 361, 530 N.E.2d 1280 (no causation when plaintiff with general knowledge of pools and common sense dove into shallow end and was injured); *Schiller v. National Presto Indus.*, 225 A.D.2d 1053, 1054, 639 N.Y.S.2d 217, 218 (4th Dep't 1996) (no causation when plaintiff was actually aware of the danger of a hot frying pan).

LR Systems argues that it is not liable because the danger was open and obvious, and because Clarke was fully aware of the hazard. As to Clarke's actual awareness, he acknowledged several times in his deposition that he knew it was dangerous to put his hand on the V-belt without first turning off the power. Clarke contends that this awareness is not sufficient to grant summary judgment because even though he was aware of the danger that his hand could be injured by the blades, he was not necessarily aware of the "particular danger" that his fingers could be injured by the in-running nip point. Pl. Mem. at 9. However, this proposed distinction is irrelevant. Clarke unquestionably was aware that putting his hand on a V-belt could result in significant injury—it does not matter whether this harm would be from the blades or the nip point. In fact, Clarke's testimony does not distinguish between the two potential hazards. Rather, his statement that it is dangerous to put your hand on a V-belt with the power on because "[t]he pulley and the

belt is spinning very fast [sic]" implies that he was aware that the belt drive itself could cause an injury.

 As Clarke was actually aware of the danger, it is not necessary to determine whether danger was sufficiently open and obvious to permit summary judgment. In regard to the open and obvious danger exception, "when a warning would have added nothing to the user's appreciation of the danger, no duty to warn exists as no benefit would be gained by requiring a warning." *Liriano,* 92 N.Y.2d at 242, 677 N.Y.S.2d at 769, 700 N.E.2d 303. Otherwise, "the list of foolish practices warned against would be so long, it would fill a volume," and would trivialize and undermine the purpose of the rule. *Id.* (quotation omitted). However, this exception is difficult to administer and fact-specific, and thus "whether a danger is open and obvious is most often a jury question." *See id.*

Accordingly, defendant's motion for summary judgment is granted regarding Clarke's failure to warn claim.

### (2)

### Design Defect

██ "A defectively designed product is one which, at the time it leaves the seller's hands, is in a condition not reasonably contemplated by the ultimate consumer and is unreasonably dangerous for its intended use; that is one whose utility does not outweigh the danger inherent in its introduction into the stream of commerce." *Scarangella v. Thomas Built Buses, Inc.,* 93 N.Y.2d 655, 659, 695 N.Y.S.2d 520, 522, 717 N.E.2d 679 (1999) (quotations omitted). Under New York law, in a strict liability claim for defective design, a plaintiff must show: (1) the product as designed posed a substantial likelihood of harm; (2) it was feasible to design the product in a safer manner; and (3) the defective design was a substantial factor in causing the plaintiff's injury. *See Voss v. Black & Decker Mfg. Co.,* 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 401–02, 450 N.E.2d 204 (1983); *Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125 (2d Cir.1999). "This standard demands an inquiry into such factors as: (1) the product's utility to public as a whole; (2) its utility to the individual user; (3) the likelihood that the product will cause injury; (4) the availability of a safer design; (5) the possibility of designing and manufacturing the product so that it is safer but remains functional and reasonably priced; (6) the degree of awareness of the product's potential danger that can reasonably be attributed to the injured user; and (7) the manufacturer's ability to spread the cost of any safety-related design changes." *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 257, 639 N.Y.S.2d 250, 255, 662 N.E.2d 730 (1995) (citing *Voss,* 59 N.Y.2d at 109, 463 N.Y.S.2d 398, 450 N.E.2d 204).

██ In a negligence claim, a plaintiff must show: (1) the manufacturer owed the plaintiff a duty to exercise reasonable care; (2) a breach of that duty that results in a defective product; (3) the defect was the proximate cause of the plaintiff's injury; and (4) loss or damage. *See Becker v. Schwartz,* 46 N.Y.2d 401, 410, 413 N.Y.S.2d 895, 899, 386 N.E.2d 807 (1978); *McCarthy v. Olin Corp.,* 119 F.3d 148, 156 (2d Cir. 1997).[5]

---

**5.** The Court of Appeals stated in dicta that "in general, ... the strict liability concept of 'defective design' [is] functionally synonymous with earlier negligence concept of unreasonable designing." *See Denny,* 87 N.Y.2d at 257–58, 639 N.Y.S.2d at 255–56, 662 N.E.2d 730.

That is, both involve a balancing of the risks and utility a particular design. *Id.* However, the Second Circuit recently noted that this area of the law is unsettled. *See Jarvis v. Ford Motor Co.,* 283 F.3d 33, 63 (2d Cir.2002).

Breach of warranty claims are distinct from strict products liability and negligence causes of action, but there is a "high degree of overlap" between them and "[a]s a practical matter, the distinction between the defect concepts in tort law and in implied warranty theory may have little or no effect in most cases." *Denny*, 87 N.Y.2d at 256, 262, 639 N.Y.S.2d at 254, 258, 662 N.E.2d 730.

 In a breach of implied warranty action, a plaintiff must demonstrate that the product was not fit for the purpose for which it was intended. *See Codling*, 32 N.Y.2d at 338, 345 N.Y.S.2d at 465, 298 N.E.2d 622; *see also Schimmenti v. Ply Gem Indus.*, 156 A.D.2d 658, 659, 549 N.Y.S.2d 152, 154 (2d Dep't 1989). In a breach of express warranty action, a plaintiff must show that there was an affirmation of fact or promise by the seller, the natural tendency of which was to induce the buyer to purchase the product, and that the warranty was relied on. *See id.* (quoting *Friedman v. Medtronic, Inc.*, 42 A.D.2d 185, 190, 345 N.Y.S.2d 637, 643 (2d Dep't 1973)).

Rather than address the legal elements of Clarke's claims, the defendant attacks the admissibility of evidence from Clarke's expert Growney. Defendants argue that if Growney's testimony and report are excluded, the jury would have to speculate about issues of proper design, and Clarke will be unable to prove the elements of any design defect claim. Def. Mem. at 12. Therefore, defendant argues, they are entitled to summary judgment. As a result, the briefs from both parties only address whether the expert testimony is admissible.

At the outset, it should be noted that the premise of defendant's argument is not entirely sound. At least in regard to the causation element of a defective design claim, courts in several cases have held that an expert is not necessary. *See Jar-*

*vis v. Ford Motor Co.*, 283 F.3d 33, 47 (2d Cir.2002); *Faryniarz v. Nike, Inc.*, 2002 WL 530997, at *2 (S.D.N.Y. April 8, 2002).

Under the Federal Rules of Evidence, the trial court must evaluate evidence for admissibility before considering that evidence in deciding a motion for summary judgment. *See* Fed.R.Evid. 104(a). The proponent of the testimony has the burden to prove by a preponderance of the evidence that the evidence is admissible. *See Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987). If the expert testimony is excluded, the court must make the summary judgment determination on the remainder of the record. *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir.1997).

Under Federal Rule of Evidence 702, the trial court acts as a gatekeeper with respect to expert testimony. *See* Fed. R.Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999). Specifically, Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. The goal of the court's gatekeeping task is to insure that the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 (1993). This gatekeeping function applies not only to scienti-

fic expert testimony, but also to technical and other specialized knowledge such as engineering. *See Kumho Tire*, 526 U.S. at 141, 147–48, 119 S.Ct. at 1171, 1174.

In assessing the reliability of a proffered expert's testimony, the court's inquiry under *Daubert* focuses not on the substance of the expert's conclusions, but on the principles and methodology used to generate the conclusions. *See id.* at 595, 113 S.Ct. at 2797. To help with this inquiry, *Daubert* laid out four non-exclusive factors the court may consider: (1) whether the expert's technique or theory can be or has been tested; (2) whether it has been subjected to peer review; (3) the known or potential rate of error of the technique or theory when applied; and (4) the existence and maintenance of standards and controls, that is, whether the technique or theory is generally accepted by the scientific community to which it belongs. *See id.* at 593–94, 113 S.Ct. at 2796–97. However, this test of reliability is "flexible," meaning a court "*may* consider one or more" of the *Daubert* factors, but that the list "neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. at 1171 (emphasis in original). Regarding the testimony of an engineering expert, the Supreme Court added that in certain cases, "it will be appropriate for the trial judge to ask, for example, how often an engineering expert's experience-based methodology has produced erroneous results, or whether such a method is generally accepted in the relevant engineering community." *Id.* at 151, 119 S.Ct. at 1176.

It is noteworthy that "[a] review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule." Advisory Committee Notes, 2000 Amendments, Fed. R.Evid. 702; *see also Travelers Property Cas. Co. v. General Elec. Co.*, 150 F.Supp.2d 360, 364 (D.Conn.2001). In ad-

dition, the Second Circuit's standard for admissibility of expert testimony is especially broad. *See Colon ex rel. Molina v. BIC USA, Inc.*, 199 F.Supp.2d 53, 75 (S.D.N.Y.2001) (citing *Boucher v. United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996)); *cf. Amorgianos v. National R.R. Passenger Corp.*, 137 F.Supp.2d 147 (E.D.N.Y.2001), *aff'd*, 303 F.3d 256 (2d Cir. 2002).

In this case, defendant does not challenge Growney's qualifications. Growney holds a B.S. in mechanical engineering from the Newark College of Engineering, and is a licensed professional engineer in New Jersey. Pl. Affirmation Ex. C. He was a mechanical engineer at several manufacturing companies from 1968 to 1994, served as the general manager of a different manufacturing company from 1994 to 1995, and has been a forensic engineer "providing technical support for the resolution of litigation involving mechanical and industrial engineering questions" since 1995. *Id.* Growney is also a member of several professional associations, including the American Society of Mechanical Engineers and the American Society of Safety Engineers. *Id.* He has testified as an expert in court or in depositions in more than 20 cases. *Id.*

Instead, LR Systems argues that Growney's testimony is unreliable, and thus inadmissible, because he has not applied the principles and methods reliably to the facts of this case as required by Federal Rule of Evidence 702. Defendant points to two facts in support of this contention. First, at several of the manufacturing companies where he worked, Growney designed or maintained safety mechanisms for industrial machines, including those powered by V-belt and similar drives. Growney Dep. at 25–26, 39, 48. For at least two of these machines, Growney retrofitted guards over the V-belt drives. *Id.* at 31, 42. However,

Growney did not design or retrofit an interlocked guard for any of these machines. *Id.* at 33, 40, 48–49. Defendant argues that since Growney did not require an interlocked guard over any of these drives, his testimony that LR Systems should have interlocked its guard cannot be reliable. Second, Growney refers in his report to a safety standard for mechanical power transmission apparatus promulgated by the American National Standards Institute ("ANSI"). *See* Growney Report ¶ 5.12. However, the ANSI standard for plastics machinery states that belts and pulley should be guarded by a fixed guard. Def. Affirmation Ex. J (ANSI 4.4.1). As the blue metal cover over the V-belt drive on the grinder that injured Clarke comported to this standard,[6] defendants argue that Growney's testimony cannot be reliable.

In response to defendant's first argument, plaintiff contends that it is not necessary to apply the *Daubert* factors to Growney's testimony. Clarke argues that defendant's challenge goes to Growney's credibility and the weight that the jury should put on his testimony, and not its reliability.

■■■ Defendant does not challenge Growney's opinion that Clarke's thumb and fingers were caught in the V-belt drive's in-running nip point, or that Clarke would not have been injured had the cover over the motor and belt drive been interlocked. *See* Growney Report ¶¶ 6.1, 6.4. Rather, defendant takes issue with Growney's conclusion that the design of the grinder in question is defective, and that the cause of Clarke's injury was the

grinder's defective design. However, as noted above, the *Daubert* factors apply to an expert's methodology or principles, not his or her conclusions. Disputes about the strength of an expert's credentials, faults in an expert's decision to use a particular methodology, or the lack of textual authority for an expert's opinion "go to the weight, not the admissibility, of his testimony." *McCulloch v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir.1995); *see also Zuchowicz v. United States*, 140 F.3d 381, 387 (2d Cir.1998). Moreover, as the Supreme Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798. Growney's failure to use an interlock on any of the V-belt guards he worked on in the past may give Clarke some issues with which to cross-examine Growney, but should not exclude Growney's testimony altogether.[7]

Citing *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), defendant argues that the court does not need to accept the opinion of an expert that is not sufficiently connected to the data. As the Supreme Court observed:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence require a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of

---

6. "A fixed guard is a barrier attached to the equipment frame, or a barrier fastened over moving parts of the equipment where the contact can take place. A fixed guard requires the use of hand tools for removal or replacement." Def. Affirmation Ex. J (ANSI 2.6).

7. A similar issue not raised by LR Systems but which could provide for fertile cross-examination is Growney's deposition testimony that he does not know of any grinders that are produced with an interlock on the motor/belt drive guard door. Growney Dep. at 255.

the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Id.* at 146, 118 S.Ct. at 519. However, an examination of Growney's report and deposition show that his methodology for reaching the conclusion that the grinder's design was defective is sufficient for his testimony to be admitted.

Growney appears to have performed some version of the risk/utility analysis necessary to determine if a product is defective under a strict liability or negligence theory under New York law. Growney noted that in-running nip points are a well-known hazard, and the consequences of a person touching the belt would be severe. Growney Report ¶¶ 5.4–5.6. Growney also observed that LR Systems knew how to interlock guard doors, that it had equipped the SG–300 with two interlocks, and that it had interlocked certain covers on other grinders. *See id.* ¶¶ 5.11, 5.16. Moreover, Growney found that it was "technologically and economically feasible to interlock the motor/drive belt access door." *Id.* ¶ 5.16. According to the report, the interlock could have been installed near the hopper interlock switch. *Id.* Although he did not say so in his report, Growney said in his deposition that doing so would have cost only $50 in 1989. Growney Dep. at 253. In addition, Growney stated in his report that the third interlock switch, which was unused because Favorite Plastics' SG–300 did not have the sound deadening blower, could have been used for an interlock on the motor/belt drive cover door. Growney Report ¶ 5.16.

Moreover, defendant's argument that Growney never designed or retrofitted an interlock guard over any of the V-belt drives on the machines that he maintained or designed while an engineer is not enough to demonstrate that Growney's testimony and report are unreliable. For all

of the machines with a V-belt drive that Growney maintained and replaced, it was only necessary to remove the fixed cover infrequently. The cover on one of the machines was only removed every few months to grease the motor, and every two to five years to replace the belts. Growney Dep. at 43–44. On a second machine, the cover was only removed every three to five years to replace the V-belts, *id.* at 46, on a third one every five years to replace the belts, *id.* at 49, and on a fourth every one to three years to work a valve and. *Id.* Presumably, these fixed covers were not otherwise removed. In contrast, Clarke testified that the cover on Favorite Plastics' SG–300 was removed as often as two to three times a week, and at least once a month. Thus, Growney's practice as an engineer is not entirely applicable to the questions about which he offers expert opinions. Accordingly, his conclusion that the design was defective is not merely an *ipse dixit*—it is based on enough sound evidence and analysis that it will not be excluded.

 Defendant's second argument— that Growney's conclusion is unreliable because the blue cover over the grinder's motor and belt drive comported with ANSI standard—is also insufficient to exclude Growney's evidence. "Compliance or lack of compliance with industry safety standards ... is not dispositive of the issue of a design defect and other evidence concerning the design and safety of the machine may be considered." *Del Cid v. Beloit Corp.*, 901 F.Supp. 539, 545 (E.D.N.Y.1995) (citing *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 906 (2d Cir.1991) and *DeRosa v. Remington Arms Co.*, 509 F.Supp. 762, 768 (E.D.N.Y.1981)); *see also Sawyer v. Dreis & Krump Mfg.*, 67 N.Y.2d 328, 337, 502 N.Y.S.2d 696, 701, 493 N.E.2d 920 (1986). Thus, simply because the grinder was in compliance with the

ANSI standard does not make Growney's conclusion unreliable.

As noted above, defendant does not make any substantive arguments regarding Clarke's design defect claims. Accordingly, as Growney's testimony is admissible, defendant's motion for summary judgment on these claims is denied.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted on Clarke's failure to warn claim, and denied on his defective design claims.